**Karene Morton THOMAS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–02–00260–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

June 12, 2003.

Patrick E. Stallings, Stallings & Mount, P.C., Houston, for Appellant.

Charles A. Rosenthal, Jr., District Attorney-Harris County, William J. Delmore, III, Chief Prosecutor, Appellate Division, and Alan Curry, Assistant District Attorney, Houston, for appellee.

Panel consists of Justices TAFT, KEYES, and HIGLEY.

## OPINION

EVELYN V. KEYES, Justice.

Karene Morton Thomas, appellant, was charged with burglary of a habitation with intent to commit sexual assault, a first

degree felony[1] punishable by imprisonment for life or for no more than 99 years and no less than five years and a fine of no more than $10,000.[2] The jury found appellant guilty, and the trial court assessed punishment at 30 years' confinement. We affirm.

## Facts

### The Charged Offense

Nelle Patton is a 71 year old woman who lives alone and enjoys playing tennis three to five times a week. She had been harassed by constant doorbell rings and knocks at her door with no one there when she answered. She had assumed that it was teenagers.

On December 4, 1999, an intruder rang Patton's doorbell "insistently" until she left her bedroom to answer the door. As she was walking down the hallway near the living room in her home, she ran into appellant. Patton described appellant as being a black man with little or no hair and gold rimmed glasses.

Patton asked who appellant was, how he had gotten into the home, and what he wanted. Appellant replied that he wanted "a little p* * * *." Patton tried to distract appellant from achieving his ultimate goal by laughing at his comment, asking him questions, and trying to make small talk. Patton backed herself against the wall in the hallway in order to protect herself. She realized that appellant had one of her knives and was covering it with a white cloth. After she told him that the knife frightened her, he dropped it.

Appellant began to grope Patton, including her breasts. Appellant penetrated Patton's vagina with his fingers and said he would not hurt her. She told him that

he was hurting her and he eventually stopped. Appellant got down on his knees and was going to attempt oral sex, when Patton laughed and told him that her legs were too long for him to do that. Appellant than grabbed Patton's hand and made her hold his penis.

Appellant began to realize that dawn was approaching. He walked into her bedroom and asked Patton if she wanted him to leave. She told him that she did. Appellant said that he would leave through the front door if she would go into her bedroom and lock the door. Patton, in fear of being raped and killed if she did that, refused and said that she would go into the bedroom if he would go into the living room. Appellant went to the living room and Patton ran to her bedroom and dead-bolted the door. She tried to call the police, but she could not because the telephone lines had been cut. She grabbed her gun from the dresser and tried to shoot it. The gun fired and went through her television, lodging the bullet in her dresser. She heard appellant move and thought that he had left, so she went to her bathroom and tried to climb out the window. She could not fit, and in attempting to get out, she laid the gun on the window sill and it fired again, hitting the neighbor's garage. Patton then ran to another bedroom and escaped through a window. She yelled for her neighbor, who called 911.

Officer Edward Srebalus arrived at Patton's home. He observed a broken window pane in the breakfast area near the back door. He attempted to recover fingerprints at the points of entry and exit, but was unsuccessful. A few weeks after the attack, Patton sat down with a sketch

---

1. *See* Tex. Pen.Code Ann. § 30.02(d) (Vernon 2003); *id.* § 22.011(f).

2. *See id.* § 12.32.

artist and produced a sketch of the intruder that closely resembled appellant.

## The Extraneous Offense at the Guilt/Innocence Phase

Georgia Garrett is a 70–year–old woman who lives alone in an apartment. In the beginning of 2000, Garrett saw the shadow of someone stooping outside her patio window. The person ran away, and she called the police. About one month later, Garrett saw a shadow again, and she again called the police. Garrett stated that both times the individual was appellant. Garrett asked the apartment complex to install a patio light, but someone kept jumping over the fence enclosing her patio and unscrewing the light bulb and also shining a flashlight into her bedroom window. On another occasion, someone left pornographic pictures titled "Promiscuous Granny" at Garrett's apartment door.

On November 6, 2000, officers were called to Garrett's apartment complex to investigate an unrelated disturbance. They had been called to the complex numerous times because of reports of a "peeping tom." While the officers were at the apartment complex, Garrett called the police because someone was in her patio. A dispatcher told the officers that a black man had been seen in one of the apartment's patios. Officer Steven May approached Garrett's apartment and saw a man standing near the window in the patio. The other officer went into Garrett's apartment and walked through the sliding glass door onto the patio to handcuff appellant. Appellant had a flashlight and a tool that could be used to open a sliding glass door.

Appellant was arrested for this offense. While in custody he consented to being placed in a line-up. Patton was unable to make a positive identification.

## The Confession

Appellant made an oral confession that was audio-taped on November 6, 2000, and was played to the jury over a renewed objection. Appellant does not contest the admissibility of the confession on appeal. In the confession, appellant admits to his interest in older women and to looking into other people's homes because he was attracted to the light coming from the windows. He states that he was face-to-face with only one woman around a year before the confession, i.e., around the time of the offense with which he was charged. Appellant admits that he entered the woman's home through a door, either the garage or the kitchen door, which he claims was open, but that he was not let into the woman's home by the woman; that he then rang her door bell; that when she answered the bell, he fondled her breasts and rubbed her legs near or in her living room where she was standing; and that her legs interested him the most. The woman told him what he was doing was wrong, told him that he looked like a nice person that would not do something like this, asked him why he was doing what he was doing, and said to him, "God bless [you]." He left after the woman asked him to leave; and the woman told him she would pray for him. Appellant identified the woman as someone who plays tennis and described her as Caucasian, in her fifties or sixties.

Appellant stated that the night he was in Garrett's patio, he left his apartment around 1:30 a.m. Appellant also explained why he was in Garrett's patio on November 6, 2000. He stated that he saw a couple of flower pots that interested him and wanted to get a closer look. He explained that he could see the flower pots from the walkway. In order to get a better look at the flower pots, he "crossed over" the fence surrounding the patio.

Appellant had no intention of taking the flower pots, and he had no idea that anyone was in the apartment.

A motion to suppress the confession was filed during pretrial and a hearing was held on that motion. The purpose of the hearing was to determine if the confession was given voluntarily. The trial court ruled that the confession was given voluntarily and found it admissible. During trial, Patton was unable to make a positive identification of appellant, testifying, "the man sitting over here looks somewhat like him, but I can't swear to it." She likewise was unable to make a positive identification of appellant's voice from the recorded confession, testifying only that appellant's voice was "similar" to her assailant's.

## Issues

In five points of error, appellant argues that (1) the trial court abused its discretion by allowing the State to offer evidence of extraneous offenses to prove appellant's identity as the offender; (2) the evidence was legally insufficient to support his conviction; (3) the evidence was factually insufficient to support his conviction; (4) he was denied effective assistance of counsel because his counsel did not obtain pretrial

rulings or object to the admissibility of the State's evidence; and (5) he was denied effective assistance of counsel because of the cumulative effect of the errors of counsel.

## Discussion

### *Extraneous Offense*

■ In his first point of error, appellant argues that the trial court abused its discretion by improperly allowing the State to offer extraneous conduct pursuant to Texas Rule of Evidence 404(b) to prove his identity as the offender. Specifically, appellant contends that no requisite connective similarities between the charged offense and the extraneous offense exist and that they are too remote in time to be admissible.[3]

■ We review the decision to admit evidence of other crimes, wrongs, or acts under an abuse of discretion standard of appellate review. *See Roberts v. State*, 29 S.W.3d 596, 600 (Tex.App.-Houston [1st Dist.] 2000, pet. ref'd). As long as the trial court's ruling was within the "zone of reasonable disagreement," there is no abuse of discretion, and we must uphold the ruling. *Id.*

---

3. Appellant also complains that other evidence improper under Rule 404(b) was offered against him to prove identity. Specifically, he complains that Patton's testimony that someone had been ringing her doorbell late at night for more than a year, May's testimony that he had been dispatched to Garrett's apartment many times for peeping tom cases and that other peeping tom incidents had occurred, and Garrett's testimony that someone had been looking in her window and leaving pornographic material on her doorstep were improperly offered as extraneous offense evidence by the State. He also complains that the State did not provide notice that this evidence was going to be offered at trial.

Appellant's trial counsel objected to the admissibility of the extraneous offense commit-

ted against Garrett under Rules 403 and 404(b), but failed to object to any other extraneous offense evidence or to lack of notice that the evidence would be offered. Therefore, appellant has failed to preserve error with regard to lack of notice or to any extraneous offenses, other than the criminal trespass against Garrett, addressed above, and these issues are waived. *See* Tex.R.App. P. 33.1(a). We note, however, that the State did provide notice to appellant that evidence of extraneous offenses that occurred from January, 2000 through June, 2000, would be offered at trial. Specifically, the State notified appellant that "[t]hroughout the year 2000 there were several trespass reports regarding Ms. Garrett, Ms. [Kelley] Cooksey and the apartment complex in which they lived. The defendant is a suspect in each case."

As a general rule, to prevent an accused from being prosecuted for some collateral crime or misconduct, the State may not introduce evidence of bad acts similar to the offense charged. *Id.* at 600–01. However, as an exception to the general rule of exclusion, evidence of "other crimes, wrongs, or acts" may be admissible if it has relevance to a material issue other than to show that the accused acted in conformity with some trait of character and the probative value of the evidence is not "substantially outweighed by the danger of unfair prejudice." *Id.* at 601. Evidence of other crimes, wrongs, or acts is relevant apart from showing character conformity if the proponent shows that it "tends to establish some elemental fact, such as identity or intent." *Id.*

Identity may be placed at issue or in dispute through the cross-examination of the identifying witness. *Page v. State,* 88 S.W.3d 755, 763 (Tex.App.-Corpus Christi 2002, pet. ref'd). This occurs only when the identifying witness has been impeached about (1) a material detail of the identification; (2) the conditions surrounding the charged offense and the witness's identification of the defendant in that situation; or (3) an earlier misidentification of the defendant. *Id.*

In this case, Patton could not visually identify appellant as the intruder. Identity was placed at issue by appellant through his cross-examination of Patton regarding whether she could identify him because of the lighting in her home, whether she saw him long enough to identify him, and whether she was wearing her glasses.

To be admissible to show identity, an extraneous offense must be so similar to the offense charged that the offenses are marked as the accused's handiwork. *Lane v. State,* 933 S.W.2d 504,

519 (Tex.Crim.App.1996). In other words, to be relevant, the evidence must bear the "signature" of the offender. *Linder v. State,* 828 S.W.2d 290, 297 (Tex.App.-Houston [1st Dist.] 1992, pet. ref'd). If there are sufficient common distinguishing characteristics between the extraneous offense and the charged offense such that the probative value of the evidence outweighs its prejudicial effect, the court may admit the evidence. *Id.* The factors of remoteness and similarity of an extraneous offense are important, not in and of themselves, but only as they bear on the relevancy and probative value of the offered evidence of extraneous offenses. *Id.* Therefore, remoteness or dissimilarity do not *per se* render an extraneous offense irrelevant. *See id.* The extraneous offense and the charged offense can, therefore, be different offenses, so long as the similarities between the two offenses are such that the evidence is relevant. *Id.*

To determine the similarity between the offenses for the purpose of establishing identity, appellate courts should take into account both the specific characteristics of the offenses and the time interval between them. *Johnson v. State,* 68 S.W.3d 644, 651 (Tex.Crim.App.2002) (citing *Lane,* 933 S.W.2d at 519). Sufficient similarity may be shown by proximity in time and place *or* by a common mode of committing the offenses. *Lane,* 933 S.W.2d at 519 (citing *Ransom v. State,* 503 S.W.2d 810, 813 (Tex.Crim.App.1974)).

In *Walker v. State,* the Texas Court of Criminal Appeals held that offenses were sufficiently similar because (1) they occurred (a) at night, (b) in the same area, (c) within a period of one month; (2) the defendant (a) was alone and (b) carried a small gun; (3) the victims were tied in a similar manner; (4) the robbery preceded the rape; and (5) all coins but pennies were taken from the victims. 588 S.W.2d

920, 924 (Tex.Crim.App.1979). In *Ransom*, the Court of Criminal Appeals held that offenses were sufficiently similar because (1) the offenses were three days apart and both offenses were (2) robberies (3) committed at gunpoint (4) by the defendant and an accomplice. 503 S.W.2d at 813.

More recently, in *Lane*, the Court of Criminal Appeals held that, although the time and place of the offenses were not in close proximity, were a decade apart and took place in different states, the mode of committing the offense and the circumstances surrounding them were sufficiently similar for the extraneous offense to be relevant to the issue of identity. 933 S.W.2d at 519. In *Johnson*, the Court of Appeals held that offenses committed within a few hours of each other, directed at lone women, and involving another victim's red Ford Taurus were sufficiently similar.[4] 68 S.W.3d at 650–52.

In the instant case, Garrett and Patton were both women in their late sixties or early seventies; they lived alone a half-mile apart. Both had been harassed for some time over approximately the same period, always at night; the assault on Patton occurred in December, 1999; the harassment of Garrett began a year before that, and appellant was arrested outside Garrett's apartment 11 months after the assault on Patton. During this time there were many reports of a peeping tom at the complex where Garrett lived. The intruder entered Patton's house by breaking a back window and then armed himself with a knife from her kitchen; appellant was apprehended on Garrett's patio with a long, bent wire for gaining entry into a patio door and a flashlight. The intruder sexually assaulted Patton; someone left pornographic pictures of elderly women outside Garrett's door the night before appellant was arrested on her patio with a tool for gaining entry. Patton described her assailant as a tall black man wearing gold-rimmed glasses; appellant is a tall

4. *See also Pena v. State*, 867 S.W.2d 97, 99 (Tex.App.-Corpus Christi 1993, pet. ref'd) (addressing similarities between the charged offense and extraneous offense involving elderly individuals); *Contreras v. State*, 838 S.W.2d 594, 599–600 (Tex.App.-Corpus Christi 1992, pet. ref'd) (listing similarities between charged offense and extraneous offense involving elderly individuals, although not directly addressing whether offenses had sufficient similarities); *but see Reyes v. State*, 69 S.W.3d 725, 738–41 (Tex.App.-Corpus Christi 2002, pet. ref'd) (finding that similarities between two offenses were common to crime itself, namely burglary of habitation with intent to commit and committing sexual assault, rather than similarities peculiar to offenses; similarities were that intruder, not wearing glasses, entered two residences in same vicinity, in early morning hours, fondled victims while they slept with child, and fled when they awoke; dissimilarities between offenses included that victims were not of same race; intruder was fully clothed in one, but wearing nothing but boxer shorts in other; on earlier occasion intruder fondled both breasts and vaginal area of person, while on latter intruder fondled only vaginal area, which resulted in penetration with his fingers; bedroom in extraneous offense was not lit, but bedroom of victim in charged offense was well lit by exterior light; several people were home in first offense, but only victim and her son were home in charged offense; and entry in extraneous offense was gained by using chair and climbing through window, but in charged offense it was through unlocked garage); *Avila v. State*, 18 S.W.3d 736, 740–42 (Tex.App.-San Antonio 2000, no pet.) (determining that similarities between two offenses were not substantial enough to warrant admissibility of extraneous offense; similarities were that both offenses occurred within city limits of Crystal City in darkness and at night, to victims who were asleep and who did not give consent to intruder to enter rooms; in both offenses victims were turned over and sexual act was in essentially same position; court held that similarities between the two offenses were those common to crime itself and not "similarities peculiar to both offenses").

black man who was wearing gold-rimmed glasses when arrested. Patton produced a sketch that closely resembled appellant.

We must uphold the trial court's decision to admit evidence of other crimes, wrongs, or acts so long as the court's ruling was within the "zone of reasonable disagreement." *Roberts,* 29 S.W.3d at 600. We find that there were sufficient common distinguishing characteristics between the extraneous offense and the charged offense of burglary of a habitation with the intent to commit sexual assault. Furthermore, we find that the time period between the charged offense and the extraneous offense, 11 months, is not so remote in time to be inadmissible under the circumstances of this case. Accordingly, the trial court did not abuse its discretion in admitting the extraneous offense evidence.

We overrule appellant's first point of error.

*Legal and Factual Sufficiency*

In his second and third points of error, appellant argues that the evidence was legally and factually insufficient to support his conviction.

In reviewing legal sufficiency, we view the evidence in a light most favorable to the verdict and ask whether any rational trier-of-fact could find the essential elements of the crime beyond a reasonable doubt. *King v. State,* 29 S.W.3d 556, 562 (Tex.Crim.App.2000); *Valencia v. State,* 51 S.W.3d 418, 423 (Tex.App.-Houston [1st Dist.] 2001, pet. ref'd). The fact finder may reasonably infer facts from the evidence before it, credit the witnesses if it cares to, disbelieve any or all of the testimony proffered, and weigh the evidence in the manner it chooses. *Bruno v. State,* 922 S.W.2d 292, 293 (Tex.App.-Amarillo 1996, no pet.).

In reviewing factual sufficiency, we examine all the evidence neutrally and ask whether proof of guilt is so obviously weak as to undermine confidence in the jury's determination or so greatly outweighed by contrary proof as to indicate that a manifest injustice has occurred. *Zuliani v. State,* 97 S.W.3d 589, 594 (Tex.Crim.App. 2003); *King,* 29 S.W.3d at 563; *Valencia,* 51 S.W.3d at 423. While conducting our analysis, if there is probative evidence supporting the verdict, we must avoid substituting our judgment for that of the trier-of-fact, even when we disagree with the determination. *King,* 29 S.W.3d at 563. The trier-of-fact is the sole judge of the weight and credibility of the witness testimony. *Johnson v. State,* 23 S.W.3d 1, 7 (Tex.Crim.App.2000).

A person commits burglary if, without the effective consent of the owner, the person enters a habitation and commits or attempts to commit a felony, theft, or an assault. Tex. Pen.Code Ann. § 30.02(a)(3) (Vernon 2003). To sustain a conviction for burglary of a habitation with the intent to commit sexual assault, a first degree felony, it must be shown that appellant entered the habitation with the intent to commit sexual assault. *Id.* § 30.02(d).

Evidence other than the extraneous offense evidence discussed above was offered at trial. Patton testified that, on the night in question, the doorbell rang "insistently" around 4:00 a.m.; she ran down the hallway from her bedroom by the living room and ran into an intruder; she asked the intruder what he was doing in her home, what his name was, and what he wanted; she pinned herself up against the wall near the living room; the intruder groped her body, including her breasts; the intruder talked about her legs, saying they were very strong legs; she told the intruder that she played tennis; and the intruder had a nice soft-spoken voice. Patton testified that she did not know that the window in her breakfast room had been broken

because the intruder had told her that her door was unlocked.

Patton described the intruder as a black male in his early thirties with little to no hair and gold-rimmed glasses. A sketch of the intruder that was drawn a few weeks after the incident was introduced into evidence. Also, Patton identified appellant as the intruder, although with the caveat that she could not "swear to it," and identified appellant's voice on the audio-taped confession as similar to the intruder.

In his confession, which was played to the jury, appellant admitted to his interest in older women and admitted to looking into other people's homes because he was attracted to the light coming from the windows. Appellant stated that he was face-to-face with only one woman around a year before the confession; identified the woman that he hurt as someone who plays tennis; admitted that he was in the woman's home; admitted that he rang her door bell; and admitted that he was not let into the woman's home by the woman, but that he entered through a door, either the garage or the kitchen door, which he claimed was open. He described the woman as Caucasian and in her fifties or sixties. He admitted that he fondled the woman's breasts and rubbed her legs near or in her living room where the woman was standing; and he admitted that her legs interested him the most. He stated that the woman told him what he was doing was wrong; the woman told him he looked like a nice person that would not do something like this; the woman asked why he was doing what he was doing; and the woman said to appellant, "God bless [you]." He stated that he left after the woman asked him to leave and that the woman told him she would pray for him.

Appellant testified at trial that he had never seen Patton until trial. Appellant denied burglarizing Patton's home.

Viewing the evidence in the light most favorable to the verdict, we hold that the evidence was legally sufficient for a rational trier-of-fact to find the essential elements of the crime beyond a reasonable doubt. Viewing the evidence neutrally, we observe that the jury decided, in this case, to believe Patton and appellant's tape recorded confession and to disbelieve appellant's testimony. Because the jury, as trier-of-fact, is the sole judge of the weight and credibility of the witness testimony, and because the proof of guilt was not so obviously weak as to undermine confidence in the jury's determination, or so greatly outweighed by contrary proof as to indicate that a manifest injustice occurred, we hold that the evidence was factually sufficient to support the verdict.

We overrule appellant's second and third points of error.

*Ineffective Assistance of Counsel*

In his fourth and fifth points of error, appellant argues that, when looking at the totality of the representation, he was denied effective assistance of counsel during the guilt/innocence phase of the trial because trial counsel did not seek and obtain pretrial rulings or object to the admissibility of the State's evidence; and he was denied effective assistance of counsel because of the cumulative effect of those errors. We address both points of error together.

To determine if a defendant has been denied effective assistance of counsel, we follow the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). First, appellant must demonstrate that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. *Howland v. State*, 966 S.W.2d 98, 104 (Tex.App.-Houston [1st Dist.] 1998), *aff'd*, 990 S.W.2d

274 (Tex.Crim.App.1999). Second, appellant must establish that counsel's performance was so prejudicial that it deprived him of a fair trial. *Id.* Thus, appellant must show that a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068; *Howland,* 966 S.W.2d at 104. Appellant has the burden to establish both of these prongs by a preponderance of the evidence. *Jackson v. State,* 973 S.W.2d 954, 956 (Tex.Crim. App.1998); *Davis v. State,* 830 S.W.2d 762, 765 (Tex.App.-Houston [1st Dist.] 1992, pet. ref'd). We cannot speculate beyond the record provided. *Jackson v. State,* 877 S.W.2d 768, 771 (Tex.Crim.App.1994); *Gamble v. State,* 916 S.W.2d 92, 93 (Tex. App.-Houston [1st Dist.] 1996, no pet.). Appellant must overcome the presumption that trial counsel's strategy was sound. *Gamble,* 916 S.W.2d at 93.

An appellant "making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. Any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Thompson v. State,* 9 S.W.3d 808, 813 (Tex.Crim.App.1999). Although there was a motion for new trial and a hearing on that motion, the record from that hearing is silent as to what appellant's trial counsels' strategy was during trial. To find that trial counsel was ineffective based on any of the asserted grounds would call for speculation, which we will not do. *Gamble,* 916 S.W.2d at 93. Moreover, appellant has made no showing that, but for his counsel's unprofessional errors, the result of the proceeding would have been different.

We overrule appellant's fourth and fifth points of error.

## Conclusion

We affirm the judgment of the trial court.

## CONCURRING OPINION

LAURA CARTER HIGLEY, Justice.

I concur in the result reached by the majority. However, because I disagree with the majority's conclusion that there were sufficient common distinguishing characteristics between the extraneous offense and the charged offense, I would hold that the trial court committed error in admitting the extraneous offense evidence.

To be admissible to show identity, an extraneous offense must be so similar to the offense charged that the offenses are marked as the accused's handiwork. *Lane v. State,* 933 S.W.2d 504, 519 (Tex.Crim. App.1996). Appellate courts take into account both the specific characteristics of the offenses and the time interval between them. *Id.* As well as basing a review of the admissibility of extraneous evidence on proximity in time, place and distinguishing characteristics, this Court must review the State's need for introducing the relevant evidence. *Montgomery v. State* 810 S.W.2d 372, 392 (Tex.Crim.App.1990). I believe there was neither sufficient proximity, sufficient distinguishing characteristics, nor sufficient need to justify admission of the extraneous offense.

*Proximity*

Although the offenses were committed within a half-mile of one another, they were not proximate in time. One court observed that "as a general rule, the greater the time period between the charged and extraneous offenses, the greater the likelihood of error in admitting the evidence of the extraneous offense." *Reyes v.*

*State,* 69 S.W.3d 725, 740 (Tex.App.-Corpus Christi 2002, pet. ref'd.). The court illustrated this observation by listing (i) a number of appellate court cases, (ii) the time period between the charged and extraneous offenses, and (iii) whether the appellate court had found error in the trial court's admission of the extraneous offense. No hard and fast rule emerged. Nevertheless, an appellate court generally found no error in admitting the evidence of the extraneous offense in cases in which the offenses occurred within two months or less of one another. Upon appeal, most offenses separated by two months or more resulted in a finding of error by the lower court. Here, there was a lapse of 11 months between the two offenses. Because the two offenses in this case are not proximate in time, we are required to find stronger similarities showing that the offenses are the handiwork of one individual. The similarities here could be common to a number of offenses targeting elderly women, and the differences are significant.

The majority's reliance on *Lane,* a case in which the offenses occurred a decade apart in two different states, is misplaced because the similarities in *Lane,* unlike the similarities here, were extraordinary enough to overcome the lack of proximity. Among other similarities, the victims were young girls of approximately the same age who were abducted from public areas near their homes, sexually assaulted, and strangled to death. 933 S.W.2d at 517. In both offenses, the defendant acted with a co-actor, involved himself in the search for the victims, and claimed each girl's underwear as a trophy of the crime. *Id.*

### Characteristics of the Offenses

The majority also relies on two cases in which the victim's age was a significant factor in the admission of the extraneous offense. In each of the cases cited, however, there existed a distinctive signature of the defendant unrelated to the age of the victims. In *Pena v. State,* the two burglaries were virtually identical. 867 S.W.2d 97 (Tex.App.-Corpus Christi 1993, pet. ref'd). The burglar entered through a back window, stole a television and jewelry, exited through the front door and used the same car, which was registered to his wife. *Id.* at 99. Likewise, in *Contreras v. State,* the robbery and aggravated sexual assault offenses were remarkably similar. 838 S.W.2d 594 (Tex.App.-Corpus Christi 1992, pet. ref'd). In both, the assailant broke into a house while the elderly couples were sleeping, extinguished any lights, hit the husband on the head, forced the wife to have oral sex, and then demanded money from the wife prior to leaving. *Id.* at 599–600.

In this case, there are no striking similarities such that we have the required distinctive signature of the defendant. Elderly women living alone are often the target of harassment, particularly at night. In this case, the harassment was the persistent ringing of Patton's doorbell, while Garrett was harassed by a peeping tom with a flashlight. Patton's phone line was cut and the assailant entered by breaking a window. The appellant did not cut Garrett's phone line nor did he show any intent to break the glass patio door. Moreover, tall black males with gold-rimmed glasses are hardly unusual in our community. The two offenses here have even less in common than the two offenses in *Reyes* where the burglaries and sexual assault offenses occurred approximately seven months apart and in each case the assailant fondled a woman sleeping with a child. 69 S.W.3d at 739. The *Reyes* court concluded that the trial court erred in admitting the extraneous offense because the danger of unfair prejudice substantially outweighed the probative value of the extraneous offense evidence. *Id.* at 741.

*State's Need to Introduce the Evidence*

It is a fundamental tenet of our criminal justice system that an accused may be tried only for the offense for which he is charged and not for being a criminal generally. *Owens v. State,* 827 S.W.2d 911, 914 (Tex.Crim.App.1992). Rule 404(b) incorporates this tenet by prohibiting the admission of extraneous misconduct evidence that shows nothing more than the accused's general propensity to commit criminal acts. TEX.R. EVID. 404(b); *Owens,* 827 S.W.2d at 914. Rule 404(b) also provides exceptions to the rule allowing the admission of extraneous offense to show, *inter alia,* proof of identity. I emphasize that this is an exception to Rule 404(b). The majority in this case, by lowering the established standards to invoke the exception, appears to decide that the *exclusion* of extraneous offenses is the exception, not the rule. I suggest that such a decision eviscerates the carefully crafted interpretation of the exception by this and other appellate courts. The majority has determined that common characteristics are not really important if the perpetrator of the extraneous offense is identified as the person accused of the charged offense. Moreover, the majority ignores *Montgomery's* caveat that prior to allowing the exception, a court must review the State's need to introduce the extraneous offense. *Montgomery,* 810 S.W.2d at 392.

There was little, if any, need for introduction of the extraneous offense. The evidence presented at trial, excluding the evidence of the extraneous offense, was sufficient to link the appellant to the burglary and attempted sexual assault. Patton was able to describe the intruder accurately, assist in providing a sketch resembling the intruder, which was introduced into evidence, and to identify appellant as the intruder, although with the caveat that she could not "swear to it."

Most importantly, appellant, in his confession, provided specific details of the crime that only the perpetrator would know. Thus, the State had abundant evidence of appellant's guilt and no need to introduce the extraneous offense.

Because I would hold that the trial court erred in admitting the extraneous offense based on the issue of identity, but that the error was harmless in light of the abundant evidence of guilt, I concur only in the judgment.