Opinion issued May 17, 2007











 





In The

Court of Appeals

For The

First District of Texas






NO. 01-05-00842-CR






LAMAR BASKIN, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 338th District Court

Harris County, Texas

Trial Court Cause No. 990299




 

MEMORANDUM OPINION

 Appellant, Lamar Baskin, was charged by indictment with capital murder, to
which he pleaded not guilty. See Tex. Pen. Code Ann. § 19.03 (Vernon Supp. 2006). 
The jury found appellant guilty as charged. The State sought the death penalty but
the jury found sufficient mitigating circumstances and assessed punishment at
confinement for life.

 Appellant raises 10 issues. In his first and second issues, appellant contends
that the trial court erred by granting the State's strike for cause as to veniremember,
Ray Lopez, and by "failing to discharge the jury panel under Batson v. Kentucky." (1)
In his third through eighth issues, appellant contends that the trial court erred by
admitting evidence of extraneous offenses. In his ninth and tenth issues, appellant
challenges the legal and factual sufficiency of the evidence as to the element of intent. We affirm.

Background

 At approximately 5:30 in the evening on December 20, 2002, the complainant,
Laura Higgins, an interior designer for Perry Homes, left the company holiday party
and stopped by Perry's warehouse a few blocks away on Hansen Street in southeast
Houston to tag furniture for a courier pickup.

Appellant was driving around in the area with his friend, Danieca Green, as his
passenger. Green testified that she and appellant saw Higgins driving alone in a
white, four-door car and that appellant followed Higgins as she drove to a warehouse. 
Higgins parked in front of the warehouse and appellant parked a few spaces away. 
The parking lot was otherwise empty. Appellant and Green watched Higgins go into
the warehouse. 

Appellant then got out of his car, took something from the trunk, and went into
the warehouse. Green, who waited in the car, tilted back the seat and turned on the
radio. Approximately 10 to 15 minutes later, appellant returned to the car and
replaced the item he had removed from the trunk. Green did not see appellant with
a gun, however, she testified that, on a prior occasion, she had seen a small pistol
behind a seat in appellant's car and that she had seen him put it in the trunk of the car. 
When appellant got into the car, he began hitting the steering wheel and mumbling,
"Damn. I killed the b----." Appellant quickly drove back to the highway and dropped
off Green a distance from her house. 

The next morning, Jerry Whitehead, a building manager for Perry Homes, saw
Higgins's car in front of the warehouse. Police arrived and went to the warehouse
with Whitehead. An outside door and an interior door between the front office and
the back warehouse were found unlocked. Police searched the warehouse and
discovered Higgins lying on the floor, deceased, with a gunshot wound to her back. 

John Varela, of the Houston Police Department, testified that the driver door
on Higgins's car was unlocked and that the car appeared to have been ransacked
inside. Houston police officer Robert Parrish testified that Higgins's purse was later
found in a delivery bay of a Kroger store located one block from appellant's house. 
There was no cash in the purse. Higgins's credit card had been taken, but there had
been no activity on the card. Higgins's car keys were found a few blocks north of the
warehouse. Higgins's jewelry was still on her or at the scene. There were no
identifiable fingerprints recovered. 

In March 2003, based on a tip phoned in to CrimeStoppers, Parrish, who had
been investigating three other aggravated robberies that had occurred in south
Houston during the preceding two-week period, obtained a picture of appellant to
create a photo line-up to present to the four people who had been shot in those
incidents. All four of the prior victims identified appellant as the perpetrator. 
Appellant was charged with capital murder. The police interviewed Green, but she
was not charged. 

At trial, Darrell Stein, a firearms examiner for the Houston Police Department,
testified that the bullets recovered from the prior incidents had been compared
microscopically with the bullet recovered from Higgins and that the examination
showed that all of the bullets had been fired from the same gun. 




Challenge for Cause

 In his first issue, appellant contends that the trial court erred by "granting the
State a causal strike against Ray Lopez, where the record fails to demonstrate that
[the] venireman was biased against any phase of the law that the state was entitled to
rely upon for conviction." The State contends that appellant failed to preserve error
because he failed to object at trial.

 The record shows that, at the close of the voir dire of veniremember number
35, Ray Lopez, the trial court sustained the State's challenge for cause on the basis
that Lopez had stated that he would hold the State to a burden of showing proof
beyond "all doubt," rather than reasonable doubt. 

A veniremember who requires proof beyond "all doubt" is challengeable for
cause on the ground of inability to follow the law. Tex. Code Crim. Proc. Ann. art.
35.16 (Vernon 2005); Castillo v. State, 913 S.W.2d 529, 533 n.1 (Tex. Crim. App.
1995). When a trial court grants a challenge for cause, any objection must be timely
raised. See Fuller, 827 S.W.2d 919, 924-25 & n.4, 5 (Tex. Crim. App. 1992). Here,
the record clearly shows that, when the State challenged for cause veniremember
Lopez, defense counsel did not state any objection, but responded, "No questions." 
Immediately after, Lopez was dismissed. Appellant has not preserved any error for
our review. See id.

Accordingly, we overrule appellant's first issue.Batson ChallengeIn his second issue, appellant contends that the trial court erred by "failing to
discharge the jury panel under Batson v. Kentucky." (2) Specifically, appellant contends
that the record does not support the prosecution's stated reason for striking
veniremember 77, Gloria Stewart. The State contends that the trial court properly
found that the State provided race-neutral reasons for its peremptory strike. We
conclude that we are precluded from conducting a meaningful review because
appellant's issue on appeal does not comport with appellant's objection at trial. 

The record shows that, at the close of the voir dire of Stewart, the following
strike and objection took place:

 [State]: We'll exercise a peremptory challenge, Your Honor. 

 [The Court]: You're going to be excused from jury service. 
Ma'am, please wait in the hallway for a second.

 (Venireperson exits courtroom)

[Defense Counsel]: Your Honor, we are making a Batson challenge. We 

 feel like this person, Ms. Stewart, gave the same
answers that the previous ones in which they
accepted, namely, Sharon Valdespino, Ricky Soles,
Clint Martin, Kenneth Aubry. They had accepted 
those people. They are all non-African-Americans. 
Ms. Stewart is an African-American, and we would
like them to tell us race neutral reasons that did not
apply to the previous ones they accepted.

At trial, appellant objected to the strike of Stewart on the theory that a
comparison of Stewart's answers to those of veniremembers Valdespino, Soles,
Martin, and Aubry would reveal that the "same answers" were given and, because
Stewart was the only African-American among the group and the only member of the
group that the State struck, Stewart had been disparately treated. 

On appeal, however, appellant presents, in three specific points, a theory that
the State misinterpreted Stewart's own answers. First, appellant contends that "the
prosecutor implied that she struck Stewart out of concerns that [Stewart] was opposed
to the death penalty," when "[t]he record clearly shows that [Stewart] was not." 
Second, appellant contends that "[t]he prosecutor also expressed concerns that
Stewart could not sit in judgment of others due to religious beliefs" and that "the
record fails to reveal any religious beliefs that would have impaired Stewart's
functioning as a juror." Finally, appellant contends that "[t]he State also expressed
concerns that Stewart might herself be prejudice[d] because she believed that blacks
had been discriminated against," and that "[t]he record simply fails to support that
[Stewart] had the beliefs or impairments that formed the basis for the prosecutor
striking her for cause [sic]." Appellant does not in his brief refer to any of the other
veniremembers that he listed in his objection in the trial court and does not point to
any of the allegedly "same answers" as raised in his objection. Hence, appellant's
issue on appeal does not comport with his objection at trial.

"The point of error raised on appeal must comport with the objection made at
trial." Wilson v. State, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002). When an issue
raised on appeal does not correspond to the objection raised at trial, the trial court has
not been given an opportunity to rule on the legal theory that is the basis of the
appeal. Cook v. State, 858 S.W.2d 467, 474 (Tex. Crim. App. 1993). Thus, nothing
is presented for appellate review. Id. 

Accordingly, we overrule appellant's second issue. Extraneous OffensesIn his third through eighth issues, appellant contends that the trial court erred
by admitting evidence of three extraneous aggravated robberies allegedly committed
by appellant. Specifically, as to each of the three offenses, appellant contends that
the evidence is not relevant and that the probative value of the evidence is
substantially outweighed by "unfair prejudice, undue delay, and confusion of the
issues relevant to the case."

A. The Applicable Law and Standard of Review Evidence of extraneous offenses is not admissible to prove the character of the
person in order to show action in conformity therewith. Tex. R. Evid. 404(b). 
However, evidence of other crimes, wrongs, or acts may be admissible for purposes
such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity,
or absence of mistake or accident. Id. Even if admissible under Rule 404(b),
evidence must be excluded if "its probative value is substantially outweighed by the
danger of unfair prejudice." Tex. R. Evid. 403. 

It is within the trial court's discretion to determine whether extraneous
evidence has relevance apart from character conformity and whether the danger of
unfair prejudice outweighs the probative value of the evidence. Moses v. State, 105
S.W.3d 622, 627 (Tex. Crim. App. 2003). We review the trial court's determination
as to the admissibility of evidence under an abuse of discretion standard. Id.; Roberts
v. State, 29 S.W.3d 596, 600 (Tex. App.--Houston [1st Dist.] 2000, pet. ref'd). If the
trial court's ruling lies within the zone of reasonable disagreement, we will affirm. 
Moses, 105 S.W.3d at 627; Roberts, 29 S.W.3d at 600.

B. Relevance

In his third, fifth, and seventh issues, appellant contends that evidence of each
aggravated robbery is inadmissible because it is "not relevant to any issue in the
case." The State contends that the evidence is admissible because it is relevant to
show proof of appellant's identity as the perpetrator. (3) 

An extraneous offense may be admissible to show identity only when identity
is an issue in the case. Lane v. State, 933 S.W.2d 504, 519 (Tex. Crim. App. 1996). 
The issue of identity may be raised by the defendant during cross-examination of the
State's witnesses. Id.; Thomas v. State, 126 S.W.3d 138, 144 (Tex. App.--Houston
[1st Dist.] 2003, pet. ref'd). "To be admissible to show identity, an extraneous
offense must be so similar to the offense charged that the offenses are marked as the
accused's handiwork." Lane, 933 S.W.2d at 519; see Thomas, 126 S.W.3d at 144
(stating that, to be considered relevant, "the evidence must bear the signature of the
offender"). Sufficient similarity may be shown by proximity in time and place or by
a common mode of committing the offenses. Johnson v. State, 68 S.W.3d 644, 651
(Tex. Crim. App. 2002) (citing Lane, 933 S.W.2d at 519); Thomas, 126 S.W.3d at
144 (considering specific characteristics and time interval between extraneous and
charged offenses). 

Here, appellant contends that he did not place his identity in issue. However,
the record shows that appellant put his identity as the perpetrator at issue when, after
Green had testified on direct examination that appellant owned a gun and that she
believed that he had it on the night of the offense, defense counsel, on cross-examination of Green, elicited testimony that, during the time period just prior to the
shooting of Higgins, someone else had possession of appellant's gun and that Green
did not see appellant with the gun on the night that Higgins was shot. 

In addition, appellant contends that "there were insufficient similarities
between the extraneous offenses and the offense at issue." The record shows that the
State introduced the following evidence of four extraneous aggravated robberies in
which all victims identified appellant as the person who had robbed and shot them,
as follows:

1. Jose Reyes

 Reyes identified appellant as the man who came into Reyes's business on
Harwin Street in south Houston as he opened on December 7, 2002. According to
Reyes, who was working alone, appellant, who came in pretending to be a customer,
stated that he needed Reyes to sign something. Appellant went to his car, returned
with a small gun, and, holding the gun to Reyes, stated, "This is a robbery. . . . Give
me the money." Reyes responded, "What money?" Appellant then shot at Reyes
twice--once hitting an office machine and once hitting Reyes in the arm. Appellant
then demanded Reyes's wallet, pulled the cash out of it, and left. Appellant did not
take any credit cards, checks, or the jewelry that Reyes was wearing. 

2. William Davis

 Davis identified appellant as the man who came into Davis's business, which
was located in a warehouse and office complex on Bissonnet Street in south Houston,
at approximately 5:40 p.m. on December 17, 2002, while Davis was closing. The
other employees had just left. According to Davis, appellant came in and asked
where a cleaning service was located in the complex. Davis told him that the service
had moved out and appellant left. Davis gathered his things to leave, set the burglar
alarm, and stepped outside to lock the door. Appellant then jumped out from behind
a column, put a gun to Davis's head, and forced Davis back into the office. Appellant
demanded, "Give me your money, give me your wallet." There was not any cash in
the wallet. Appellant emptied Davis's pockets, taking $125.00. When the store alarm
sounded and Davis refused to turn it off, appellant shot Davis in the abdomen and
left. Davis went to close and lock the door before he called for help. At the doorway,
he peered out into the parking lot to try to get a description of appellant's car. 
Appellant, who was sitting in his car, saw Davis and yelled, "Don't make me come
back and shoot you again." 

 3. and 4. Edward Cole and Paul Winters 

 Cole identified appellant from a lineup as the man who came into H&H Music
Company, located on Clementshire Street in south Houston, as he was closing at
approximately 7:45 p.m. on December 17, 2002. The other employees had just left.
Cole heard a knock at the door and, when he opened it, appellant, who had been
crouching down to one side, jumped at Cole with a gun and forced him back into the
office. Appellant then shot Cole in the arm and knocked him to the floor. Appellant
reached into Cole's pocket, removed Cole's wallet, and took out Cole's cash and
credit cards, demanding access codes. Appellant began rummaging around in the
store. Cole, who was lying on the floor, heard the front door open and heard a
gunshot in the next room.

 Paul Winters, a United Parcel Service driver, had approached the doorway of
H&H Music with a delivery and saw a man he later identified as appellant standing
at the threshold. Winters asked if the business was still open. Appellant said yes and
told him to come in. When Winters walked in, appellant shot him in the back and
Winters fell to the ground. Appellant demanded Winters's wallet. Winters explained
that his wallet was in the delivery truck. Appellant demanded the keys and went
outside. Moments later, appellant returned and demanded that Winters go out with
him to get the wallet. Winters complied and, when he handed appellant the wallet,
Winters saw appellant's face. 

The State also introduced evidence, in the form of testimony by Houston Police
Department Firearms Examiner Darrel Stein, that the bullets recovered from Reyes,
Davis, Cole, and Winters, when compared microscopically with the bullet recovered
from Higgins, showed that all of the bullets were fired from the same .32 caliber
weapon.

In sum, the interval of time between the offenses was short in that the shootings
of Davis, Cole, and Winters occurred hours apart on the same evening and the
shooting of Higgins occurred just three days later. See Johnson, 68 S.W.3d at 651
(considering offenses that occurred within short interval of time to be evidence of
similarity as to identity); Walker v. State, 588 S.W.2d 920, 924 (Tex. Crim. App.
1979) (considering six offenses within one month to be evidence of similarity as to
identity). The offenses all occurred across an area of south Houston. See Walker,
588 S.W.2d at 924 (considering offenses taking place in the same area to be evidence
of similarity as to identity); Ransom v. State, 503 S.W.2d 810, 813 (Tex. Crim. App.
1974) (same). Further, appellant engaged in a similar mode of committing each of
the offenses in that appellant, acting alone, targeted a business that had just opened
or had just closed, took the time to ensure that his victim was alone, used deception
to enter, and shot each of them. See Lane, 933 S.W.2d at 519 (considering specific
modes to be evidence of distinguishing characteristics that went to identity). 

We conclude that the trial court did not abuse its discretion by determining that
the extraneous offense evidence was relevant to the issue of identity. 

C. Rule 403 Balancing 

 Specifically, in his fourth, sixth, and eighth issues, appellant contends that the
probative value of the evidence in each extraneous offense was substantially
outweighed by the danger of unfair prejudice because "appellant never placed his
identity in issue at trial" and because "the extraneous aggravated robbery offense was
not so similar in characteristics to the alleged offense as to constitute a 'signature'
offense." 


 Although evidence is admissible under Rule 404(b), we must consider whether
"its probative value is substantially outweighed by the danger of unfair prejudice" by
examining (1) how compellingly the evidence serves to make more or less probable
a fact of consequence, (2) the potential for the evidence to impress the jury in some
irrational but indelible way, (3) how much trial time the proponent needs to develop
the evidence, and (4) how great is the proponent's need for the evidence. See Tex.
R. Evid. 403; Montgomery v. State, 810 S.W.2d 372, 389, 390 (Tex. Crim. App.
1990); Jaggers v. State, 125 S.W.3d 669, 670 (Tex. App.--Houston [1st Dist.] 2003,
pet. ref'd).

Here, the record shows that the evidence presented makes more probable a fact
of consequence, namely, that appellant is the person who caused Higgins's death by
shooting her. The potential for the evidence to impress the jury in an irrational but
indelible way was not significant because the trial court instructed the jurors to limit
their consideration of that evidence to the issues of "motive, intent, [and] identity." 
We must presume that the jury followed the instruction when, as here, no evidence
has been presented to rebut that presumption. See Thrift v. State, 176 S.W.3d 221,
223-24 (Tex. Crim. App. 2005). While some time was taken to develop the
testimony as to the extraneous offenses, we cannot conclude that the amount of time
was undue, given the number of offenses involved. Finally, the State's need for the
evidence was significant because the State lacked direct evidence identifying
appellant as the person who shot Higgins. Appellant contends that the State did have
direct evidence of identification, in the form of Green's testimony. However, the
record shows that Green did not see appellant shoot Higgins. 

We conclude that the trial court did not abuse its discretion by determining that
the probative value of the evidence was not outweighed by its danger of prejudice.
See Moses, 105 S.W.3d at 627. 

We must uphold the trial court's decision to admit evidence of other crimes,
wrongs, or acts so long as the court's ruling was within the "zone of reasonable
disagreement." Roberts, 29 S.W.3d at 600. Here, we conclude that there were
sufficient common distinguishing characteristics between the extraneous offenses and
the charged offense. We hold that the trial court did not abuse its discretion by
admitting the extraneous evidence of the prior aggravated robberies. Accordingly,
we overrule appellant's third, fourth, fifth, sixth, seventh, and eighth issues.

Sufficiency of the Evidence

 In his ninth and tenth issues, appellant challenges the legal and factual
sufficiency of the evidence to support his conviction because, alleges appellant, the
evidence fails to show that he had the requisite intent to cause Higgins's death at the
time of the commission of the alleged underlying robbery.



A. Standard of Review 

 A legal sufficiency challenge requires us to determine whether, after viewing
the evidence in the light most favorable to the verdict, any rational trier of fact could
have found the essential elements of the offense beyond a reasonable doubt. King v.
State, 29 S.W.3d 562, 562 (Tex. Crim. App. 2000); Howley v. State, 943 S.W.2d 152,
155 (Tex. App.--Houston [1st Dist.] 1997, no pet.). Although our analysis considers
all of the evidence presented at trial, we may not re-weigh the evidence and substitute
our judgment for that of the factfinder. King, 29 S.W.3d at 562. 

 We begin the factual sufficiency review with the presumption that the evidence
supporting the jury's verdict is legally sufficient. Clewis v. State, 922 S.W.2d 126,
134 (Tex. Crim. App. 1996). When conducting a factual-sufficiency review, we view
all of the evidence in a neutral light. See Cain v. State, 958 S.W.2d 404, 408 (Tex.
Crim. App. 1997). We will set the verdict aside only if (1) the evidence is so weak
that the verdict is clearly wrong and manifestly unjust or (2) the verdict is against the
great weight and preponderance of the evidence. Johnson v. State, 23 S.W.3d 1,
10-11 (Tex. Crim. App. 2000). Under the first prong of Johnson, we cannot conclude
that a conviction is "clearly wrong" or "manifestly unjust" simply because, on the
quantum of evidence admitted, we would have voted to acquit had we been on the
jury. Watson v. State, 204 S.W.3d 404, 416-17 (Tex. Crim. App. 2006). Under the
second prong of Johnson, we cannot declare that a conflict in the evidence justifies
a new trial simply because we disagree with the jury's resolution of that conflict. Id. 
Before finding that evidence is factually insufficient to support a verdict under the
second prong of Johnson, we must be able to say, with some objective basis in the
record, that the great weight and preponderance of the evidence contradicts the jury's
verdict. Id.

 In conducting the factual sufficiency review, we must address the evidence
that, according to the appellant, most undermines the jury's verdict. See Sims v. State,
99 S.W.3d 600, 603 (Tex. Crim. App. 2003). We may not re-weigh the evidence and
substitute our judgment for that of the fact-finder. King, 29 S.W.3d at 562. The
factfinder alone determines what weight to give contradictory testimonial evidence
because that question depends on how the factfinder evaluates credibility and
demeanor. Cain, 958 S.W.2d at 408-09. As the determinor of the credibility of the
witnesses, the factfinder may choose to believe all, some, or none of the testimony
presented. Id. at 407. 

 The standards of review for legal and factual sufficiency challenges are the
same for direct and circumstantial evidence cases. Sharp v. State, 707 S.W.2d 611,
614 (Tex. Crim. App. 1986).

B. Capital Murder

 A person commits capital murder if he commits murder as defined under Texas
Penal Code section 19.02(b)(1) and, inter alia, he "intentionally commits the murder
in the course of committing or attempting to commit . . . robbery." Tex. Pen. Code
Ann. § 19.03 (Vernon Supp. 2006). A person commits murder under section
19.02(b)(1) if he "intentionally or knowingly causes the death of an individual." Id.
§ 19.02(b)(1) (Vernon 2003). A person commits robbery if, in the course of
committing theft and with intent to obtain or maintain control of property, he
intentionally, knowingly, or recklessly causes bodily injury to another, or
intentionally or knowingly places another in fear of imminent bodily injury or death.
Id. § 29.02(a). A person acts intentionally with respect to the nature or result of his
conduct, when it is his conscious objective or desire to engage in the conduct or cause
the result. Id. § 6.03(a).

 Here, the trial court instructed the jury that "if you find beyond a reasonable
doubt that . . . [appellant], . . . while in the course of committing or attempting to
commit the robbery of [Higgins], intentionally cause[d] the death of [Higgins] by
shooting [Higgins] with a deadly weapon, then you will find [appellant] guilty of
capital murder, as charged in the indictment." 

C. Legal Sufficiency of the Evidence

 In his ninth issue, appellant contends that the evidence was legally insufficient
because "a reasonable trier of fact could not have found beyond a reasonable doubt
that appellant had the intent to cause the death of the complainant at the time of the
alleged offense." Appellant claims that "the only evidence of intent came from the
testimony of Danieca Green" and that "a close examination of Green's testimony
suggests that the appellant never had the . . . intent to cause the complainant's death."

 Appellant contends that the only evidence of appellant's intent came from
Green's testimony that, when appellant got back into the car at the Perry warehouse,
he was "mumbling under his breath and . . . hitting the steering wheel" and "saying,
damn, I killed the B." Appellant argues that a close examination of the following
testimony by Green on cross-examination shows that appellant did not have the
specific intent to cause Higgins's death:

[Defense Counsel]: And I think you testified that when [appellant]
came to the car, he was beating on the
steering wheel and you were trying to read his
lips, but what you think you read was damn,
I killed that woman, and that was because he
was agitated, upset at the time?

[Green]: Yes, sir.

[Defense Counsel]: It didn't appear that [appellant] intentionally
ever killed anybody, did he?

[Green]: I wouldn't know. He just ---when he got---.

Intent may be inferred from circumstantial evidence such as the acts, words,
and conduct of the appellant. Guevara v. State, 152 S.W.3d 45, 50 (Tex. Crim. App.
2004). Intent to kill may be inferred from the use of a deadly weapon, unless it is
reasonably apparent that serious bodily injury or death could not result from the
particular manner of use. Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim. App.
1996); Ahrens v. State, 43 S.W.3d 630, 634 (Tex. App.--Houston [1st Dist.] 2001,
pet. ref'd). A firearm is, per se, a deadly weapon. Tex. Pen. Code Ann.
1.07(a)(17)(A) (Vernon 2003). When a deadly weapon is used and death results, the
inference of an intent to kill is almost conclusive. Flanagan v. State, 675 S.W.2d
734, 745 n.9 (Tex. Crim. App. 1982). 

Here, the record shows that Green had been riding around with appellant on the
evening of the incident when appellant began to follow a woman, later identified as
Higgins, who was alone in a white, four-door car. Green testified that appellant
followed Higgins to a warehouse, that the parking lot was empty, that he hesitated
slightly before he pulled into the parking lot, and that he parked near Higgins's car. 
Green testified that she and appellant watched Higgins go into the warehouse, that
appellant got out of his car, went around to the trunk, removed something, and went
into the warehouse after Higgins. Green testified that, on a prior occasion, she had
seen a gun, partially hidden under a towel, behind a seat in appellant's car and that
she saw appellant retrieve the gun, state that he had to "put it up," and put it in the
trunk. From these facts, the jury could have reasonably inferred that appellant kept
a gun his trunk and that he retrieved the gun before following Higgins into the
warehouse. 

It was Green's testimony that appellant returned 10 to 15 minutes later and that
"[h]e went to the trunk and whatever he took out, he put back in." Green testified that
appellant then got into the car and began hitting the steering wheel and mumbling, "I
killed the b----." From these facts, the jury could have reasonably concluded that
appellant was referring to having killed the person that Green saw him follow into the
warehouse, Higgins. 

Further, Green testified that appellant drove back to the highway very quickly
and dropped Green off some distance from her house, refusing to drive her
completely home. See Wilkerson v. State, 881 S.W.2d 321, 324 (Tex. Crim. App.
1994) (finding that intent may be inferred from evidence of flight from the scene). 

The next morning, Higgins was found at the warehouse deceased. Dr. Morna
L. Gonsoulin, an assistant medical examiner from the Harris County Medical
Examiner's office, testified that Higgins died from a single gunshot wound to her
back. Officer J. Varela testified that the driver door on Higgins's car was unlocked
and that the car appeared to have been ransacked inside. Officer R. Parrish testified
that Higgins's purse was later found in a delivery bay of a Kroger store located one
block from appellant's house and that there was no cash in the purse.

In addition, the record shows that the trial court admitted four extraneous
aggravated robberies, in part, for purposes of determining appellant's intent. Three
of the four shootings took place just three days prior to the charged offense. The four
complainants in the extraneous offenses each testified that appellant took their cash
and shot them in close proximity, without regard to whether they had cooperated with
his demands. Davis testified that appellant shot him in the abdomen, and Winters
testified that appellant shot him in the back. See Ex parte Thompson, 179 S.W.3d
549, 555 & n.18 (Tex. Crim. App. 2005) (stating, "It is both a common sense
inference and an appellate presumption that a person intends the natural consequences
of his acts . . . and that the act of pointing a loaded gun at someone and shooting it
toward that person at close range demonstrates an intent to kill." (citations omitted));
Jones, 944 S.W.2d at 647 (stating that intent to kill may be inferred from the use of
a deadly weapon); Ahrens, 43 S.W.3d at 634 (same). 

Green's testimony that she and appellant purposefully followed Higgins, whom
they saw driving alone on the interstate, to a closed warehouse, that Green knew
appellant kept a gun in the trunk, that appellant got out of the car, retrieved something
from the trunk, followed Higgins into the warehouse, returned minutes later, replaced
the item in the trunk, got in the car, reported that he had killed someone and quickly
drove away, then Higgins was found shot in the back the next morning, supports a
conclusion, especially taken in light of the extraneous offense evidence, that appellant
intended to kill Higgins. See Flanagan, 675 S.W.2d at 745 n.9; Ahrens, 43 S.W.3d
at 634. In addition, the bullet recovered from Higgins matched the bullets recovered
in the extraneous offenses. Further, the evidence shows that Higgins's car had been
ransacked and her purse was found, without her cash, a block from appellant's house. 

Viewing the evidence in the light most favorable to the verdict, we hold that
a rational jury could have found beyond a reasonable doubt that there was sufficient
evidence that appellant intended to cause Higgins's death during the commission of
a robbery. See King, 29 S.W.3d at 562; Howley, 943 S.W.2d at 155. 

We overrule appellant's ninth issue.

D. Factual Sufficiency of the Evidence

 In his tenth issue, appellant claims that the evidence was factually insufficient
because "the record fails to show that the appellant had the intent to cause the death
of the complainant at the time of the alleged offense."

 As laid out above, the State put on evidence that appellant purposefully
followed Higgins, whom he saw driving alone, to a closed warehouse, and followed
her inside, after having retrieved an item from the trunk. The evidence shows that
appellant returned minutes later, replaced the item in his trunk, got in the car, reported
that he had killed someone, and then quickly drove away. The next morning, Higgins
was found deceased in the warehouse with a gunshot wound to her back. The bullet
recovered from Higgins matched the bullets recovered in the extraneous offenses. 
Further, the evidence shows that Higgins's car had been ransacked and her purse was
found, without her cash, a block from appellant's house. The State also put on
evidence that appellant committed four extraneous aggravated robberies in the two
weeks prior to the instant offense, three of which occurred just three days prior to the
charged offense, and that, in each case, appellant took cash and shot his victim
without regard to their cooperation. 

 Appellant contends that "the only evidence of intent came from the testimony
of Danieca Green" and that "for all the reasons previously urged, her testimony was
insufficient to establish that the appellant had the specific intent to cause the
complainant's death." The record shows that Green's testimony was not the only
evidence of intent presented. Furthermore, the jury was not limited to considering
only Green's stated belief as to appellant's intent or the meaning of his behavior. 

 After considering all of the evidence in a neutral light, we cannot conclude that
the evidence is so weak that the verdict is clearly wrong and manifestly unjust or that
the verdict is against the great weight and preponderance of the evidence. See
Johnson, 23 S.W.3d 11. The evidence is therefore factually sufficient to support
appellant's conviction. 

 Accordingly, we overrule appellant's tenth issue.

Conclusion

 We affirm the judgment of the trial court.

 


 Laura Carter Higley

 Justice 

Panel consists of Justices Nuchia, Higley, and Wilson. (4) 

Do not publish. Tex. R. App. P. 47.2(b).
1. 
2. 
3. 
 
 
 
 ' 
 
 -- ' 
4.