

# NUMBER 13-19-00048-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

JOSE SALVADOR FLORES,                                                     Appellant,

v.

THE STATE OF TEXAS,                                                        Appellee.

## On appeal from the 138th District Court
## of Cameron County, Texas.

## MEMORANDUM OPINION

### Before Justices Longoria, Hinojosa, and Tijerina
### Memorandum Opinion by Justice Tijerina

Appellant Jose Salvador Flores appeals his conviction of burglary of a habitation. *See* TEX. PENAL CODE ANN. § 30.02. The trial court sentenced Flores to thirteen years' confinement. By three issues, Flores contends that his motions to suppress evidence should have been granted, the trial court improperly allowed extraneous evidence, and

the evidence is insufficient to support the verdict.[1] We affirm.

## I. MOTION TO SUPPRESS

By his first issue, Flores contends that the trial court erroneously denied his motions to suppress evidence. Specifically, Flores argues that law enforcement's initial stop of his vehicle was made without reasonable suspicion and that the search of the residence where the police discovered the stolen property was illegal.

### A. Standard of Review

We review a trial court's ruling on a motion to suppress for abuse of discretion, *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010), employing a bifurcated standard of review. *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000) (en banc) (citing *Guzman v. State*, 955 S.W.2d 85, 88 (Tex. Crim. App. 1997) (en banc)). We give almost total deference to the trial court's findings of historical fact that are supported by the record, to mixed questions of law, and to facts that turn on an evaluation of credibility and demeanor. *See Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007) (citing *Guzman*, 995 S.W.2d at 89). We "review de novo 'mixed questions of law and fact' that do not depend upon credibility and demeanor." *See id.* (quoting *Montanez v. State*, 195 S.W.3d 101, 107 (Tex. Crim. App. 2006)); *Guzman*, 995 S.W.2d at 89.

We must view the evidence in the light most favorable to the trial court's ruling. *See State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court has not made a finding on a relevant fact, we imply the finding that supports the trial court's

---

[1] Usually, we must review the issue that grants the most relief first, and Flores would be entitled to the most relief if he had prevailed on his legal sufficiency challenge. However, for ease of reading and to avoid repeating ourselves unnecessarily, we address Flores's legal sufficiency challenge last. *See* TEX. R. APP. P. 47.1.

ruling, as long as it is supported by the record. *Id.*

We must uphold the trial court's ruling if it is correct under any theory of law applicable to the case. *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005). "Absent a clear abuse of discretion, the ruling on the admissibility of evidence will not be disturbed." *Fonseca v. State*, 881 S.W.2d 144, 149 (Tex. App.—Corpus Christi–Edinburg 1994, no writ) (citing *Rivera v. State*, 808 S.W.2d 80, 96 (Tex. Crim. App. 1991)).

## B. Initial Stop

### 1. Pertinent Facts

On January 25, 2018, Flores was stopped without a warrant by San Benito police officers and arrested for burglary of a habitation on Chapman Street in San Benito, Texas occurring on January 22, 2018. Subsequently, Flores was charged with the offense, and he filed a motion to suppress evidence acquired due to that initial stop. The trial court held a hearing on Flores's motion to suppress.

At the hearing, Mario Perea, a captain with the San Benito police department testified that on January 25, he accompanied the San Benito police chief, Michael Galvan to lunch as a passenger in Chief Galvan's unmarked vehicle. The State asked Captain Perea, "And what was the purpose for you being on patrol on this day?" Captain Perea responded, "We were actually going to go grab a bite to eat for lunch and Chief Galvan advised me that he had received a tip about a suspect vehicle, which is a white Volvo, involved in a burglary [occurring on Chapman Street] possibly being [at] a residence on South Sam Houston." Captain Perea said they left the station "to go check that out first before [they] went to lunch." Captain Perea acknowledged that within the department

3

there was an active "be on the lookout" or "BOLO" for the white Volvo.

According to Captain Perea, they were traveling south when they "approached Turner Street, [they] noticed a white Volvo coming out—traveling east on Turner right here on this crosstown."[2] The State asked, "[I]n your time and in your experience being in San Benito, would you say that Volvo, a white SUV Volvo in particular, is a common vehicle within the city?" Captain Perea replied, "No . . . We just haven't seen too many of them. We discussed that in briefing, also, which it shouldn't be hard to find." Captain Perea stated that although the entire department was looking for a white Volvo, no other white Volvos had been spotted. As Captain Perea and Chief Galvan were traveling on Sam Houston Street, they saw the white Volvo, and Flores turned his white Volvo onto the same street behind their vehicle. Captain Perea explained:

> We slowed down because we wanted to look at it again and—but we noticed that the vehicle also slowed down. So we slowed down a significant amount of speed and so did the vehicle. It wouldn't catch up to us. That's what we were trying to do when we slowed down.
>
> . . . .
>
> We continue south on Sam Houston and the vehicle is behind us at this time. We are approaching Liberty Estates and we slow down again, we pass Liberty Estates at that time. The vehicle, like I said, was behind us and continued south and it makes a right into Liberty Estates. And at that time we make a U-turn and proceed [directly] behind it.
>
> . . . .
>
> The vehicle continues on to Liberty Estates and makes a right turn on to Washington. At that time we observed it was traveling very slow. It looked like it was looking for a place to turn. There are several houses on both sides, but it never actually made the turn. So it proceeded all the way this

---

[2] The State asked Captain Perea to draw lines with a highlighter on a demonstrative map of the route they took.

way, and then it went all the way to the dead end. Once it reached the dead end, it turned into the last house and reversed.

Captain Perea believed that Flores's behavior was suspicious; he said, "It just didn't look like the vehicle belonged there and in the area where we had located it, it raised our suspicion that this is the vehicle that was possibly involved in the burglary on Chapman Street." Captain Perea remarked that he was suspicious because "you drive into a neighborhood—we get behind cars all the time. They go directly to where they need to go, or if they are visiting, they know where the destination is. This vehicle . . . was going very slow, looking for a place to turn. It slowed down, tr[ied] to turn to the house and [kept] on going straight." On cross-examination, Captain Perea stated that Flores attempted "to turn into several different residences that are lined up there on Liberty Estates" and that Flores did not turn until he reached the dead end.

Captain Perea stated that Chief Galvan told him that the rims on Flores's Volvo "matched" the rims on the suspect vehicle.[3] The State asked, "So up until this point, correct me if I'm wrong, you have the indicators of a white Volvo SUV, unique rims. You also mentioned that white Volvos are not very common in the city of San Benito?" Captain Perea said, "Correct." Flores did not object. On cross-examination, Captain Perea testified that he had seen the surveillance video of the suspect vehicle, which he "used" while looking out for a similar vehicle.

Captain Perea stated that when Flores made a U-turn, he noticed that Flores's

---

[3] Flores objected on the grounds of hearsay and no personal knowledge when Captain Perea stated that Chief Galvan told him that Flores's vehicle had the same rims. However, the trial court did not rule on the objection and instead stated, "Okay. Repeat the last statement, please." However, Captain Perea did not repeat that Chief Galvan told him that the rims were the same.

Volvo did not have a front license plate. The State asked, "And collectively it was made your personal knowledge that there was no front license plate in the actual surveillance footage on the photos?" Captain Perea responded, "Yes." According to Captain Perea, when they saw Flores's white Volvo, Flores was traveling "[m]aybe less than a mile" from the location of the house where the burglary occurred on Chapman Street. Captain Perea also replied, "Yes" when the State asked him if he believed it was suspicious that Flores was traveling "very close to the vicinity [of the burglary] and also coming from that actual road that needs to be taken to get to Chapman" Street. The State asked if Captain Perea took that into account when he decided to stop Flores. Captain Perea said, "Yes."

On cross-examination, Flores asked why Captain Perea decided to stop him. Captain Perea responded,

> [T]he vehicle looked suspicious, like I said. The information that we had received about a white Volvo committing the burglary at Chapman three days ago, and pretty much the vehicle is not common. So when we saw it back in the same area where the burglary occurred, and then the way it was trying to avoid us. We slowed down a significant amount and the vehicle was still trying like to stay behind us. So when he turned into Liberty Estates and got behind it, then it looked suspicious. He didn't look like he knew where he was going. He was, like I said, trying to turn into different residences until he got to a dead end. He had to turn into a residence and then back out. So that pretty much raised our suspicions [and to] stop the vehicle.

On redirect examination, the State asked, "Captain, based on your training and experience, did you believe the vehicle that you stopped to be the same vehicle involved on the burglary on January 22nd?" Captain Perea said, "Yes, I believe there was a high probability that it was."

After allowing argument from both sides, the trial court denied Flores's motion to

suppress.

**2. Applicable Law**

An investigative detention is a seizure for purposes of Fourth Amendment analysis. *Johnson v. State*, 912 S.W.2d 227, 235 (Tex. Crim. App. 1995). To justify the detention, the State must provide evidence showing sufficient facts to prove that reasonable suspicion existed that a particular person had engaged in criminal activity. *Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001).

Reasonable suspicion justifies a warrantless seizure of a person. *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011). An investigative stop is, by definition, a warrantless seizure. *Crain*, 315 S.W.3d at 49.

Reasonable suspicion to conduct an investigative stop exists if, under the totality of the circumstances, the officer has specific, articulable facts that, combined with rational inferences from those facts, would lead to a reasonable conclusion that the person detained is, has been, or soon will be engaged in criminal activity. *Derichsweiler*, 348 S.W.3d at 914; *Crain*, 315 S.W.3d at 52. This is so even if in isolation the facts and circumstances known or imputed to the detaining officer seem innocent. *Derichsweiler*, 348 S.W.3d at 917. These facts must amount to more than a mere hunch or suspicion. *Crain*, 315 S.W.3d at 52; *Davis v. State*, 947 S.W.2d 240, 244 (Tex. Crim. App. 1997). However, the known facts need not point to the commission of a particular penal infraction for reasonable suspicion to exist. *Derichsweiler*, 348 S.W.3d at 916.

**3. Discussion**

In *Derichsweiler*, the appellant was staring and grinning at a couple for about thirty

seconds while they waited in their car at a drive-thru restaurant. *Id.* at 909–10. The couple then parked their car and noticed that the appellant was parked in front of them and that he was again staring and grinning at them. *Id.* The appellant circled around and pulled up next to the couple and continued to stare and grin at them. *Id.* The couple called police who arrested the appellant. *Id.* The Texas Court of Criminal Appeals held that although a close call, the appellant's repetitive and "strangely persistent, if admittedly non-criminal, behavior, gave rise to a reasonable suspicion that he was about to engage in criminal activity." *Id.* at 917.

In *Garcia v. State*, a non-anonymous informant reported to 911 that the appellant "repeatedly drove through the same neighborhood at an extremely slow rate of speed during the night in a high-crime area," and the appellant stared at the informant and the informant's friends "in such a manner as to make them fear for their safety." No. 13-12-00111-CR, 2013 WL 3770861, at *1 (Tex. App.—Corpus Christi–Edinburg July 18, 2013, no pet.) (mem. op., not designated for publication). Relying on *Derichsweiler*, this Court held that under the totality of the circumstances, the "appellant's behavior . . . as observed by [the informant], while non-criminal, was strange enough to give rise to reasonable suspicion." *Id.* at *3. Thus, we concluded that the officer's investigative stop of the appellant was justified. *Id.* (citing *State v. Kerwick*, 393 S.W.3d 270 (Tex. Crim. App. 2013); *McQuarters v. State*, 58 S.W.3d 250, 253 (Tex. App.—Fort Worth 2001, pet. ref'd)).

Here, Captain Perea testified that they pursued Flores's vehicle because it

8

matched a white Volvo SUV leaving the scene of the burglary on Chapman Street.[4]

According to Captain Perea, white Volvos, such as the one driven by Flores are rare in San Benito, and he observed Flores driving it in the vicinity of the prior burglary. Captain Perea noticed that Flores's rims matched the rims on the suspected white Volvo which he had observed on the video, and both were missing their front license plate. In addition, Captain Perea testified that when they drove in front of Flores's vehicle, Flores suspiciously slowed down and tried to avoid them. Then, according to Captain Perea, when they drove behind Flores's vehicle, Flores drove very slow as if he were lost and did not appear to have a destination. Flores drove to a dead-end street, attempting to turn at multiple houses (never turning) and then made a U-turn when he reached the dead end. Flores was located driving around the same area that the burglary occurred at an extremely slow rate of speed in a vehicle that Captain Perea recognized as the vehicle in the video. In addition, Flores's vehicle did not have a front license plate just like the vehicle Captain Perea recalled from the video.[5] We conclude that under the totality of the circumstances, Flores's behavior as observed by Captain Perea, while non-criminal, was

---

[4] On appeal, Flores argues that he was stopped on the basis of an anonymous tip. However, the tip that Captain Perea referenced during his testimony was not that Flores committed a crime. The tip was that a white Volvo SUV was in the area of the Chapman Street burglary, and Captain Perea did not state that he relied on this tip to justify stopping Flores. Thus, we disagree that this case requires analysis pursuant to anonymous tip case law. *See Davis v. State*, 989 S.W.2d 859, 863 (Tex. App.—Austin 1999, pet. ref'd) ("To justify a police officer's conclusion that a crime has been or is being committed, the officer generally cannot rely alone on a police broadcast of an anonymous phone call to establish probable cause or reasonable suspicion.").

[5] The State argues on appeal that Captain Perea had reasonable suspicion to stop Flores because the vehicle was missing its front license plate, which is a violation. However, during the motion to suppress hearing, Captain Perea stated that although he recalled that the vehicle did not have a front license plate, he could not recall if it had a paper-type temporary license plate, which would not be a violation and that he did not give Flores a ticket for such a violation. Thus, for purposes of our analysis, we will not rely on this basis for the trial court's ruling.

strange enough to give rise to reasonable suspicion to conduct an investigative stop. *See Derichsweiler*, 348 S.W.3d at 914; *see also Garcia*, 2013 WL 3770861, at *3. Thus, although a close case, the trial court did not abuse its discretion in denying Flores's motion to suppress as the trial court followed guiding rules and principles. Next, we will determine whether Flores was entitled to suppress the evidence based on his second ground.

## C. The Search

### 1. Pertinent Facts

After stopping Flores, the officers upon searching his vehicle found a piece of paper with an address in Brownsville, Texas written on it (the Calle Cielo address). At the motion to suppress hearing, the State presented the testimony of Elizabeth Cantu, a sergeant with the San Benito police department, who stated that she went to the Calle Cielo address with her partner. Sergeant Cantu explained that they were investigating a burglary of habitation after a "vehicle that was stopped that was seen on video, and we were trying to find out where [Flores] was living, because the name he had given, I guess, was different. So we didn't really know where he was from or where he lived." Sergeant Cantu testified that after knocking on the door, Kimberly Torres answered the door holding a dog. The dog was "a small, what was reported was three-month-old, but it was a small puppy, like a [Y]orkie, where it had a lot of hair, brown with black," and it had been reported stolen from the Chapman Street home.

According to Sergeant Cantu, Torres informed her that although she did not own the home, she and her boyfriend had been staying at the residence since January 9, 2018. Sergeant Cantu testified that Torres said that Elsa Aguilar owns the residence and

10

that Aguilar was not present as she and Aguilar's boyfriend (Flores) did not live at the residence. On cross-examination, Sergeant Cantu agreed that Torres did not own the home but that Torres told her that she rented it.

Torres stated that a friend, (Flores), had gifted the dog to Torres's boyfriend, and he gave it to her daughter. Sergeant Cantu testified that she informed Torres that she was investigating a burglary and looking for stolen items, including the dog. Torres said that "she had nothing to hide" and consented to a search of the premises.[6] The trial court admitted a consent to search form that Torres signed. The officers entered the home, but they did not find any stolen items.

Flores testified that he and his girlfriend, Aguilar, reside at the Calle Cielo address and had lived there since June 2017. On cross-examination, Flores stated that Torres had lied when she said that she lived at the Calle Cielo address and claimed that the police coerced Torres into consenting to a search of the property. Flores testified that he helps Aguilar to pay the mortgage on the home, which is owner-financed; however, he did not know the full name of the person from whom they purchased the home. Flores acknowledged that when he was arrested, he told police that he lived at his mother's residence. The State asked Flores if Aguilar lived at the Calle Cielo residence when Torres lived there. Flores replied, "No."

The State argued that Flores did not have standing to challenge the search of the Calle Cielo address because he did not reside there. In addition, the State argued that Torres, who resided at the property, gave consent to search the property, and the dog

---

[6] Torres returned the dog to the officers.

11

was in plain view. Flores argued that he lived at the Calle Cielo address and Torres was merely a guest unable to give proper consent to search the property. The trial court denied the motion to suppress.

### 2. Discussion

On appeal, Flores only makes one argument: that as a guest, Torres did not have the authority to consent to a search of the Calle Cielo address. However, Flores does not specifically challenge the trial court's implied finding that he did not have standing to challenge the search. *See State v. Copeland*, 501 S.W.3d 610, 613 (Tex. Crim. App. 2016) ("If the appellant fails to argue a 'theory of law' applicable to the case on appeal, that argument is forfeited."); *Marsh v. State*, 343 S.W.3d 475, 479 (Tex. App.—Texarkana 2011, pet. ref'd) (stating that the appellant must challenge all of the grounds for the trial court's ruling on appeal); *see also State v. Hoskins*, No. 05-13-00416-CR, 2014 WL 4090129, at *2 (Tex. App.—Dallas Aug. 19, 2014, no pet.) (mem. op., not designated for publication) ("If even one independent ground fully supports the complained-of ruling or judgment, but an appellant does not assign error to that independent ground, we must accept the validity of that unchallenged independent ground, and thus any error in the grounds challenged on appeal is harmless because the unchallenged independent ground fully supports the complained-of ruling or judgment."); *Johns v. State*, No. 14-11-00420-CR, 2012 WL 1899195, at *8 (Tex. App.—Houston [14th Dist.] May 24, 2012, no pet.) (mem. op., not designated for publication) ("By failing to challenge and adequately brief the basis for the trial court's ruling, appellant cannot demonstrate that the trial court abused its discretion in admitting the video interview into evidence.");

*State v. Aviles*, No. 10-07-00371-CR, 2008 WL 976955, at *1–2 (Tex. App.—Waco Apr. 9, 2008, no pet.) (mem. op., not designated for publication) (explaining that because the State, as the appellant, failed to challenge each ground for the trial court's ruling the granting of a motion to suppress was correct).

Nonetheless, the trial court heard evidence that Torres lived at the Calle Cielo home, that Aguilar and Flores did not reside at the home, that Torres paid Aguilar rent, and that Flores told police he lived with his mother at a different address. Viewing the evidence in the light most favorable to the trial court's ruling, we conclude that the trial court could have reasonably found that Torres had actual authority to consent to the search of the Calle Cielo address. *See State v. Rodriguez*, 521 S.W.3d 1, 19 (Tex. Crim. App. 2017) ("A third party can consent to a search to the detriment of another's privacy interest if the third party has actual authority over the place or thing to be searched."). Therefore, the trial court did not abuse its discretion by denying Flores's motion to suppress. We overrule Flores's first issue.

## II.     EXTRANEOUS OFFENSE EVIDENCE

By his second issue, Flores contends that the trial court improperly allowed extraneous offense evidence of another criminal act. The State responds that the evidence of his previous crime was admissible to prove identity.

## A.     Standard of Review

We review a trial court's evidentiary ruling for an abuse of discretion. *Ramos v. State*, 245 S.W.3d 410, 417–18 (Tex. Crim. App. 2008). If the trial court's ruling is correct under any applicable legal theory and is reasonably supported by the record, we will not

disturb that ruling. *Id.* at 418. Unless it has abused its discretion, we will not disturb a trial court's decision to exclude evidence. *See Martin v. State*, 173 S.W.3d 463, 467 (Tex. Crim. App. 2005). If the trial court's evidentiary ruling is within the "zone of reasonable disagreement," we will uphold it. *Id.*

**B.      Applicable Law**

Texas Rule of Evidence 404(b) provides that generally evidence of extraneous offenses, such as a "crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." *See* TEX. R. EVID. 404(b). However, such evidence may be admissible for "another purpose," which can include, among other things, "intent, preparation, plan, knowledge, identity." *Id.*

"When the State seeks to admit extraneous offense evidence under a theory of modus operandi," the evidence of the defendant's prior criminal acts must show that they were "'so nearly identical in method [to the charged offense] as to earmark them as the handiwork of the accused.'" *Owens v. State*, 827 S.W.2d 911, 915 (Tex. Crim. App. 1992) (citing *Collazo v. State*, 623 S.W.2d 647, 648 (Tex. Crim. App. 1981), *quoting* E. Cleary, McCormick's Handbook of the Law of Evidence 449 (2d ed. 1972))). "No rigid rules dictate what constitutes sufficient similarities; rather, the common characteristics may be proximity in time and place, mode of commission of the crimes, the person's dress, or any other elements which mark both crimes as having been committed by the same person." *Segundo v. State*, 270 S.W.3d 79, 88 (Tex. Crim. App. 2008). "Usually, it is the accretion of small, sometimes individually insignificant, details that marks each crime as the

14

handiwork or modus operandi of a single individual." *Id*. Remoteness or dissimilarity does not per se render an extraneous offense irrelevant on the issue of identity. *Thomas v. State*, 126 S.W.3d 138, 144 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).

The Texas Court of Criminal Appeals has held that extraneous offense evidence showing the modus operandi of a defendant is admissible to prove identity. *See Casey v. State*, 215 S.W.3d 870, 881 (Tex. Crim. App. 2007). Extraneous-offense evidence is admissible to prove identity if the extraneous offense is "so similar to the charged offense that the offenses illustrate the defendant's 'distinctive and idiosyncratic manner of committing criminal acts.'" *Page v. State*, 213 S.W.3d 332, 336 (Tex. Crim. App. 2006) (quoting *Martin v. State*, 173 S.W.3d 463, 468 (Tex. Crim. App. 2005)); *Lane v. State*, 933 S.W.2d 504, 519 (Tex. Crim. App. 1996). "[S]ufficient similarity may be shown by proximity in time and place or by a common mode of committing the offenses." *Lane*, 933 S.W.2d at 519.

## C.    Pertinent Facts

The State offered a video of a different burglary occurring on San Patricio Street near the area of the Chapman Street burglary by a person driving a white Volvo. Flores objected stating that it was inadmissible under Texas Rule of Evidence 404(b). The State countered that it was admissible to show motive, plan, and modus operandi. The trial court held a hearing outside the presence of the jury.

The video shows that the Volvo used in the San Patricio burglary is white, is missing the front license plate, has rims that match Flores's Volvo, and has a black strip on its side similar to Flores's Volvo. The State presented evidence that the person who

15

committed the San Patricio burglary kicked in the door of the residence in a similar fashion to how the door was kicked in at the Chapman Street burglary.[7] After viewing the video of the San Patricio burglary, the trial court concluded that the Volvo in that video matched the Volvo used in the Chapman Street burglary. The trial court overruled Flores's objection.

**D.  Discussion**

At trial, the trial court admitted a video of the suspect committing the burglary of the Chapman Street residence. The video shows that the intruder drove a white Volvo SUV with a black side strip, lacking a front license plate, and having unique rims. These characteristics match those of the Volvo in the video of the San Patricio burglary, which Flores was arrested for committing. In addition, the Chapman Street burglary occurred in the same neighborhood of the San Patricio burglary. The person who committed the San Patricio burglary kicked in the door to commit the crime in a similar way as the person who committed the Chapman Street burglary.

The San Patricio burglary was so similar to the Chapman Street burglary that the offenses illustrated a distinctive and idiosyncratic manner of committing criminal acts. *See Page v. State*, 213 S.W.3d 332, 336 (Tex. Crim. App. 2006) (quoting *Martin v. State*, 173 S.W.3d 463, 468 (Tex. Crim. App. 2005)); *Lane*, 933 S.W.2d at 519. Therefore, the trial court did not abuse its discretion in concluding that the two offenses were so nearly identical in method as to earmark them as Flores's handiwork. *See Owens*, 827 S.W.2d

---

[7] Flores was arrested for the San Patricio burglary; however, the charges were dismissed.

16

at 915. We overrule Flores's second issue.[8]

### III. SUFFICIENCY OF THE EVIDENCE

By his third issue, Flores contends that the evidence is insufficient to support the verdict.

### A. Standard of Review and Applicable Law

In determining the sufficiency of the evidence, we consider all the evidence in the light most favorable to the verdict and determine whether a rational factfinder could have found the essential elements of the crime beyond a reasonable doubt based on the evidence and reasonable inferences from that evidence. *Whatley v. State*, 445 S.W.3d 159, 166 (Tex. Crim. App. 2014); *Brooks v. State*, 323 S.W.3d 893, 898–99 (Tex. Crim. App. 2010) (plurality op.). The factfinder is the exclusive judge of the facts, the credibility of witnesses, and the weight to be given their testimony. *Brooks*, 323 S.W.3d at 899. We resolve any evidentiary inconsistencies in favor of the judgment. *Id.*

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). "Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Villarreal*, 286 S.W.3d at 327; *see Malik*, 953 S.W.2d at 240.

---

[8] It appears that Flores claims that he did not receive proper 404(b) notice of this extraneous offense. However, when Flores objected to the extraneous offense evidence, the trial court asked, whether "404(b) notice was given or not?" Flores replied, "Yes, Judge, but we were supposed to have a bench hearing or something, Your Honor." Therefore, this claim is without merit, and we will not address it.

A person commits the offense of burglary of a habitation as charged in this case if the person "without the effective consent of the owner . . . enters a habitation, or a building (or any portion of a building) not then open to the public, with intent to commit" theft. TEX. PENAL CODE ANN. § 30.02. A person commits theft "if he unlawfully appropriates property with intent to deprive the owner of property." *Id.* § 31.03. "Appropriation of property is unlawful if . . . it is without the owner's effective consent." *Id.*

## B.    Discussion

The evidence in the record viewed in the light most favorable to the verdict shows that Flores was caught driving the same vehicle that was captured in the video of the Chapman Street burglary. The vehicle used for the burglary was a white Volvo SUV missing the front license plate, with a black side strip, and the same unique rims that matched Flores's vehicle. The owner of the Chapman Street premises testified that she recognized Flores by his "figure," and insisted that, although it was not possible to see the face of the person in the video, it was Flores in the video. Flores walked in front of the jury. After observing Flores walk, the owner agreed that she recognized his "figure," the "arm swing," and his height and build as the same person in the video. The jury was able to determine whether Flores's build, gait, and mannerisms were the same as the person on the video.

The owner testified that she had not given Flores permission to enter her home and that she did not know him. The owner testified that the person stole, among other things, her dog.[9] Flores had been arrested and charged for breaking into a home in the

---

[9] The owner of the Chapman Street home testified that other items taken were a Samsung 65-inch TV, a 45-inch TV, a laptop computer, and a PS4 game console. None of these items were returned to her.

same neighborhood as the Chapman Street burglary. The dog was returned to the owner.

The jury saw the video of the Chapman Street burglary and pictures of Flores's vehicle, and it was able to compare the two. Chief Galvan agreed with the State that Flores's vehicle matched the vehicle in the video of the Chapman Street burglary "to a tee".

We conclude that a rational factfinder could have found the essential elements of the crime beyond a reasonable doubt based on the evidence and reasonable inferences from that evidence. *Whatley*, 445 S.W.3d at 166; *Brooks*, 323 S.W.3d at 898–99. We overrule Flores's third issue.

## IV.    CONCLUSION

We affirm the trial court's judgment.

JAIME TIJERINA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
17th day of June, 2021.

---

However, the dog that the police located was returned.

19