**Opinion issued July 6, 2023**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-22-00073-CR**

———————————

**MATTHEW CLEMENTS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 182nd District Court**
**Harris County, Texas**
**Trial Court Case No. 1634159**

---

**MEMORANDUM OPINION**

Matthew Clements was convicted of aggravated robbery. During the punishment phase of the trial, Clements pleaded "true" to enhancement paragraph one and "not true" to enhancement paragraph two. The jury found both enhancement paragraphs "true," and Clements was sentenced to 50 years' confinement. Clements

complains that (1) there is insufficient evidence to support the conviction; (2) evidence of extraneous offenses should not have been admitted during the guilt-innocence phase of trial; (3) it was error to allow a jury instruction that commented on the weight of the evidence; and (4) evidence of extraneous offenses should not have been admitted during the punishment phase. Because there is sufficient evidence to support Clements's conviction, the evidence of extraneous offenses was properly admitted, and the jury instruction was permissible, we affirm.

## Background

### A. Aggravated Robbery at Taco Cabana

On May 29, 2019, T. Murray, the complainant, was working as a sales associate at a Walmart located at the intersection of Tidwell and Highway 290. During her break, she went to a Taco Cabana. She stopped in the Taco Cabana parking lot to let a vehicle pass in front of her, but the vehicle stopped. A man inside the vehicle pointed a gun at her and demanded money.

Murray held her hands in the air and told him she had no money on her. The man got angry and continued demanding money. The man was distracted by a family leaving the Taco Cabana, giving Murray a chance to run behind her car. The vehicle drove away. Murray tried to photograph the license plate with her phone, but she was only able to get photos of the vehicle, not the license plate. Murray then called 911. Murray's husband arrived while she was waiting for the police, so she went

back to Walmart to tell her manager what happened. Murray also discussed the incident with people at the Taco Cabana after she called the police.

Officer J. Wright responded to the 911 call. Murray told Officer Wright about the robbery and gave him her cell phone photos. Murray described the perpetrator as a white unshaven male wearing glasses, a hat, and a dirty white shirt. The vehicle was described as "a 90's [sic] model white pickup truck that had black appeared to be metal, headache rack[1] behind the rear windshield. It had silver running boards with black steps. The back of the truck in the tailgate area was either lacking paint or dirty." No license plate number was provided because Murray's photo showed the vehicle had a paper license plate. The vehicle photo and description were provided to officers in the area. Officer Wright also described the suspect as a white male, unshaven, in his late 30s, with a chrome-colored firearm and black-rimmed glasses.

While still at Taco Cabana, Officer Wright received radio transmissions from other units in the area that another robbery was occurring in Spring Branch. Officer Wright and his partner went to that location. Meanwhile, Sgt. A. Miller was responding to a call about a suspicious white male with a weapon at the 2901 block

---

[1] "A headache rack is a wall-like safety device installed behind the back of a truck's cab that protects against cargo entering the cab and injuring its occupants if the brakes lock up." *Medina v. State*, 411 S.W.3d 15, 18 n.2 (Tex. App.—Houston [14th Dist.] 2013, no pet.)

3

of Bingle Road, near the Taco Cabana. The caller described the suspect's vehicle as a white, "old style" truck with paper license plates. The call was placed only 10 to 15 minutes after the police received the call about the Taco Cabana robbery. While searching the area, Sgt. Miller saw a dirty white truck with a black headache rack driven by a white man. Sgt. Miller notified Officer Wright, who was only a mile away, that he had spotted the suspect's vehicle. A pursuit of the truck began when more backup units arrived.

During the high-speed pursuit, a passenger, later identified as D. Landin, bailed out of the truck and was detained without incident. Landin told the police that he jumped out because Clements, the driver, was acting crazy. Officer Wright's pursuit of Clements ended when another patrol unit lost control and collided with his vehicle. But Officer K. Rodas continued to pursue Clements until he reached a dead-end street in a residential neighborhood. Clements exited the driver's side of the truck and fled on foot. An officer in a helicopter unit saw Clements trying to hide underneath a silver truck. Soon after, Officer Rodas detained Clements. Officer Rodas searched Clements and found a cell phone belonging to the victim of a different robbery. Officer Rodas also found a firearm nearby along the same route that Clements had fled. The gun had a brown slide, a black grip, and a chrome barrel. A baseball cap was also retrieved from the back of Clements's truck.

The next day, Murray met with Sgt. J. Delacruz who showed her a photo array that included Clements's photo. She narrowed it down to two photos before ultimately selecting the photo of Clements as the perpetrator. Murray also identified Clements at trial.

While in jail, on a recorded call, Clements stated that he was on his way to pick up a friend in Spring Branch when he decided to go on a "mission," a term that often refers to a robbery.[2]

## B.     Extraneous Aggravated Robbery at Convenience Store

At trial, the State presented evidence of Clements's involvement in two other aggravated robberies that occurred close in time and proximity to the charged offense. J. Bautista-Mora testified that on May 29, 2019, he and his nine-year-old daughter were buying ice at 2900 Bingle Road when a white man pointed a black gun at them and ordered him to hand over his wallet. Bautista-Mora pulled out his wallet and told the gunman to come closer to get it. The gunman continued to demand that Bautista-Mora surrender his wallet, but he told the gunman he would call the police. The gunman fled the scene in a dirty white pickup truck, and Bautista-Mora called the police.

Officers showed Bautista-Mora a photographic array, but he could not identify the suspect because his face had been covered. At trial, he testified that he was sure

---

[2]     Sgt. Delacruz testified that "mission" is a term commonly used to refer to a robbery.

that the white truck in the photograph taken by Murray was the truck the suspect was driving.

**C.      Extraneous Aggravated Robbery at Mattress Store**

R. Reyes testified that on May 29, 2019, he witnessed a robbery at 2205 Bingle Road outside the mattress store owned by A. Delacruz, his brother-in-law. Reyes and Delacruz were sitting in front of the store when a white man pulled up in a dirty white truck. The man got out of the truck, pointed a black gun at Delacruz's head and said, "give me your fucking money." Delacruz handed over his wallet and cellphone, and the gunman fled in the truck.

Reyes testified that the gunman was wearing a dirty white shirt. He identified the truck in Murray's photograph as the same truck used by the gunman. Delacruz's cellphone was later recovered and returned by the police.

**Sufficiency of the Evidence**

Clements contends that the evidence is insufficient because the eyewitness identification of him as the robber was unreliable and there is no other evidence connecting him to the location or the offense. The State argues that Murray's testimony was sufficient.

**A.      Standard of Review**

We review the legal sufficiency of the evidence by considering all the evidence, in the light most favorable to the jury's verdict, to determine whether any

rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We defer to the factfinder to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from the facts. *Williams*, 235 S.W.3d at 750; *Cary v. State*, 507 S.W.3d 761, 766 (Tex. Crim. App. 2016). Our role is that of a due process safeguard, and we consider only whether the factfinder reached a rational decision. *See Malbrough v. State*, 612 S.W.3d 537, 559 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd); *see also Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016) (the reviewing court's role "is restricted to guarding against the rare occurrence when a fact finder does not act rationally").

"In reviewing the legal sufficiency of the evidence, a court must consider both direct and circumstantial evidence, and any reasonable inferences that may be drawn from the evidence." *Malbrough*, 612 S.W.3d at 559 (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)); *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). Circumstantial and direct evidence are equally probative in establishing the defendant's guilt, and circumstantial evidence alone can be sufficient. *Malbrough*, 612 S.W.3d at 559 (citing *Clayton*, 235 S.W.3d at 778). "For evidence to be sufficient, the State need not disprove all reasonable alternative hypotheses that are inconsistent with a defendant's guilt." *Id.* The appellate court

"considers only whether the inferences necessary to establish guilt are reasonable based on the cumulative force of all the evidence when considered in the light most favorable to the jury's verdict." *Id.* (citing *Wise*, 364 S.W.3d at 903; *Hooper v. State,* 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). We review factual sufficiency of the evidence under the same standard of review as that for legal sufficiency. *See Edwards v. State*, 497 S.W.3d 147, 156–57 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd).

## B. Analysis

To convict Clements of aggravated robbery, the State was required to prove that (1) while committing theft of property owned by Murray, (2) with intent to obtain or maintain control of the property, Clements (3) intentionally or knowingly threatened her or placed her in fear of imminent bodily injury and death, and (4) used or exhibited a deadly weapon. *See* TEX. PENAL CODE §§ 29.02(a)(2), 29.03(a)(2). A person commits theft if he "unlawfully appropriates property with intent to deprive the owner of property." *Id.* § 31.03(a).

At trial, Murray explained that the robbery lasted about a minute and a half and involved her and Clements having a back-and-forth conversation where he kept demanding her money and she kept telling him that she had none. Murray testified that she still remembered the perpetrator's face when she was shown the photo array by police the day after the incident. She was able to narrow down the photo array to

8

two people before confidently selecting the photo of Clements as the perpetrator. She also identified Clements at trial. Murray's testimony alone is sufficient to support the jury's finding that Clements was the perpetrator. *See Aguilar v. State*, 468 S.W.2d 75, 77 (Tex. Crim. App. 1971) (testimony of single eyewitness was sufficient to support jury's verdict); *see also Gibbs v. State*, 555 S.W.3d 718, 728 (Tex. App.—Houston [1st Dist.] 2018, no pet.) ("Identity may be established by the testimony of a single eyewitness."); *Shah v. State*, 414 S.W.3d 808, 812 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) ("It is well-established that the testimony of a sole witness to an offense may constitute legally sufficient evidence to support a conviction.").

Clements argues that Murray's testimony was unreliable because it was impeached by Dr. T. Terrell, an expert in the psychology of eyewitness memory and identification. Dr. Terrell testified that the accuracy of an eyewitness's identification can be adversely affected by the presence of a weapon because it draws away the witness's attention. Dr. Terrell also explained that the risk of mistaken identification increases when there is cross-racial identification, like Murray, a black female, identifying Clements, a white male. Dr. Terrell speculated that Murray may have misidentified Clements as the robber based on the length of time it took her to make the identification and because she may have confused Clements with Landin, who resembles Clements. But it is the jury's role to evaluate the weight and credibility of

9

a witness's testimony. *See Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017) ("The jury is the sole judge of the credibility of witnesses and the weight to be given to their testimonies, and the reviewing court must not usurp this role by substituting its own judgment for that of the jury.") (citing *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012)).

Murray gave a detailed description of the vehicle's sole occupant to Officer Wright when he arrived, describing the robber as a white male with glasses, a "5 o'clock shadow," and a hat on his head. Beyond Murray's identification, she also provided two photos of the robber's vehicle. The vehicle was a dirty white truck with a black headache rack covering the rear window, silver running boards with black steps, and paper license plates. And she provided the police with two photos of the robber's vehicle with distinctive features. Using Murray's description and photos, the police found Clements driving a vehicle that matched the photo within four miles of the initial robbery. Clements was then arrested after fleeing from the police. Nearby Clements, a black and chrome-colored handgun was found that contained his DNA on the trigger. The jury could infer guilt from both Clements's flight and disposal of the handgun. *See Burks v. State*, 876 S.W.2d 877, 903 (Tex. Crim. App. 1994) (evidence of flight is admissible as circumstance from which inference of guilt may be drawn); *see also Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App.

2004) (attempt to conceal evidence is probative of wrongful conduct and a circumstance of guilt).

There was also evidence that Clements implicated himself in the crime during a recorded phone call from jail stating that he went on a "mission" while he was on his way to pick up a friend. The jury heard testimony from Sgt. Delacruz that "mission" is a term commonly used to refer to a robbery.

Finally, there was the testimony of Bautista-Mora and Reyes, eyewitnesses of similar aggravated robberies that occurred in the same area immediately after the initial robbery. Bautista-Mora testified that he was robbed at gunpoint by a white man whose face was covered. Bautista-Mora identified the truck driven by Clements as the same dirty white truck used by the gunman in the extraneous robbery. Reyes likewise testified that he saw a white man in a dirty white truck rob his brother-in-law at gunpoint. Reyes identified Clements's truck was the same truck used during the aggravated robbery of his brother-in-law. And the cellphone stolen from Reyes's brother-in-law was found in Clements's pocket.

Ultimately, we defer to the factfinder to resolve any conflicts in testimony, weigh evidence, and draw reasonable inferences from the facts. *Williams*, 235 S.W.3d at 750; *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009) (we give great deference to the jury's credibility determinations). In addition to Murray's direct testimony identifying Clements as the perpetrator, there was evidence of

Clements's flight, concealment of evidence, and others who identified Clements as having committed similar crimes in a nearby area around the time of the incident. *See Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013) (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (circumstantial evidence as probative as direct evidence in establishing guilt and can be sufficient alone in establishing guilt)). Viewing the evidence in the light most favorable to the verdict, the jury could have reasonably inferred that Clements committed the aggravated robbery of Murray. *See Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011). We overrule Clements's sufficiency issue.

## Extraneous Acts: Guilt-Innocence

Clements contends that the trial court erred by admitting testimony that Clements committed extraneous aggravated robberies during the guilt-innocence phase of his trial because the prejudicial effect of the evidence outweighed its probative value. The State argues that the evidence was properly admitted because Clements disputed identity and because the probative value outweighed any prejudicial effect.

### A.    Standard of Review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016); *Page v. State*, 137 S.W.3d 75, 78 (Tex. Crim. App. 2004) (Rule 404(b) ruling is reviewed

for an abuse of discretion); *Jabari v. State*, 273 S.W.3d 745, 751 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (same). A trial court abuses its discretion when its decision falls outside the zone within which reasonable persons might disagree. *Henley*, 493 S.W.3d at 83 (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008)); *Binnion v. State*, 527 S.W.3d 536, 545 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd). "A trial court's ruling is generally within this zone if the evidence shows that 1) an extraneous transaction is relevant to a material, non-propensity issue, and 2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury." *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009). The trial court's ruling will not be disturbed if supported by any legal applicable theory. *Id.* at 344 (citing *Sewell v. State*, 629 S.W.2d 42, 45 (Tex. Crim. App. 1982)).

## B.    Rules 404(b) and 403

To be admissible under Rules 403 and 404(b), the evidence must be (1) relevant, aside from its tendency to show conformity with character, and (2) the probative value must substantially outweigh any prejudice, while not confusing the issues or misleading the jury. *See* TEX. R. EVID. 403, 404(b); *see also Page*, 213 S.W.3d 332, 336 (Tex. Crim. App. 2006); *Johnston v. State*, 145 S.W.3d 215, 220 (Tex. Crim. App. 2004). Relevant evidence, evidence that tends to make a fact of consequence more or less probable, is admissible unless provided otherwise by law.

TEX. R. EVID. 401, 402. Generally, evidence of a prior extraneous offense is not admissible to prove a person's character to show that, on a particular occasion, the person acted in conformity with that character. TEX. R. EVID. 404(b)(1). But extraneous offense evidence may be admissible for a purpose other than character conformity, such as proving "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." TEX. R. EVID. 404(b)(2); *Page*, 137 S.W.3d at 78.

To support admission of extraneous offenses based on identity, identity must be at issue. *Page*, 137 S.W.3d at 78; *Lane v. State*, 933 S.W.2d 504, 519 (Tex. Crim. App. 1996). Identity can be raised by the defense on cross-examination of a witness. *Page*, 137 S.W.3d at 78; *Lane*, 933 S.W.2d at 519. This occurs when the identifying witness has been impeached about (1) a material detail of the identification; (2) the conditions surrounding the charged offense and the witness's identification of the defendant in that situation; or (3) an earlier misidentification of the defendant. *Thomas v. State*, 126 S.W.3d 138, 144 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd); *see Robbins v. State*, 88 S.W.3d 256, 261 (Tex. Crim. App. 2002) (vigorous cross-examination can place at issue a permissible purpose under Rule 404(b)). Identity may also be placed in dispute by the defendant's opening statement, as well as by affirmative defensive evidence. *Segundo v. State*, 270 S.W.3d 79, 86 (Tex. Crim. App. 2008); *Hudson v. State*, 112 S.W.3d 794, 801 (Tex. App.—Houston

14

[14th Dist.] 2003, pet. ref'd) ("In raising a defensive theory, a defendant opens the door for the State to offer rebuttal testimony concerning an extraneous offense if the extraneous offense has characteristics common with the offense for which the defendant is being tried."). The trial court has considerable latitude in determining that identity is disputed and that the extraneous offenses are relevant to the identity issue. *Page*, 137 S.W.3d at 78; *Segundo*, 270 S.W.3d at 86.

Here, defense counsel raised the issue of identity during her opening statement. Defense counsel's cross-examination of Murray also suggested that Murray's fear of being shot, her focus on the gun, the brief amount of time she interacted with the perpetrator, the length of time it took for her to select a suspect out of a photo array, and her description of the perpetrator not exactly matching the suspect she selected show that the defense questioned the accuracy of her identification.[3] *See Page*, 213 S.W.3d at 336 (cross-examining complainant about defendant's weight was sufficient to raise identity); *see also Page*, 137 S.W.3d at 79 ("That the impeachment was not particularly damaging or effective in light of all the evidence presented is not the question. The question is whether impeachment

---

[3]     Identity was the primary focus of Clements's closing argument. Defense counsel noted that multiple witnesses could identify the white truck, but not all the witnesses could identify Clements. Defense counsel discussed how all the witnesses stated that only one person robbed them, but there was evidence that two people were in Clements's vehicle at some point. It was also raised that Landin and Clements both fit the description of the robber.

occurred that raised the issue of identity. If so, Rule 404(b) permits the introduction of extraneous offenses that are relevant to the issue of identity."). Then, Clements's expert witness, Dr. Terrell, testified that Murray may have misidentified Clements as the perpetrator due to the weapon and a cross-racial identification. Considering the multiple ways Clements raised identity, the trial court did not abuse its discretion in finding that identity was at issue. *See Page*, 137 S.W.3d at 78; *Segundo*, 270 S.W.3d at 86.

But raising the issue of identity "does not automatically render evidence of an extraneous offense admissible." *Jabari*, 273 S.W.3d at 751 (citing *Page*, 213 S.W.3d at 336). Such evidence must demonstrate a much higher degree of similarity to the charged offense than extraneous offenses admitted for other purposes, such as intent. *Bishop v. State*, 869 S.W.2d 342, 346 (Tex. Crim. App. 1993). Without a high degree of similarity, the probative value of the extraneous offense evidence is outweighed by its prejudicial effect. *Id.* When reviewing a trial court's decision to admit such evidence, appellate courts should consider the specific characteristics of the offenses and the time interval between them. *Thomas v. State*, 126 S.W.3d 138, 144 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). Sufficient similarity can be shown by proximity in time and place or by a common mode of committing the offenses. *Lane*, 933 S.W.2d at 519 (citing *Ransom v. State*, 503 S.W.2d 810, 813 (Tex. Crim. App. 1974)).

16

Here, Murray described the robber as a white male, in his late 30s, unshaven, with black-rimmed glasses, a ball cap, and a dirty white shirt. Murray explained that the robber pointed a gun at her and demanded money. Murray photographed the robber's vehicle, and it was described by Officer Wright as a '90s model, dirty, white, pickup truck with a black steel headache rack behind the rear window, a dirty tailgate, and chrome running boards with black steps. Her photograph of the truck also showed that it had paper plates. Within ten minutes of Officer Wright's arrival at the Taco Cabana, while he was still speaking to Murray, the police received a call about a second robbery.

Sgt. Miller testified that the call for the second robbery at the convenience store occurred about ten to twelve minutes after the initial robbery call. The suspect in the second robbery was described as a white male, 39 to 40 years old, average height, wearing a dirty white shirt and gray pants driving a white, old-style truck with paper plates. The second robbery occurred about a mile-and-a-half from the Taco Cabana. Sgt. Miller drove by the second robbery location and continued southbound on Bingle Road in search of a truck matching the description of the suspect's vehicle. After driving about a quarter of a mile further south on Bingle Road, he saw apparent victims of another robbery on the roadway waving their arms to attract his attention. Sgt. Miller directed another patrol unit to respond to that location while he continued southbound in search of the suspect.

17

Bautista-Mora testified that a white male driving a dirty, white, older-model truck pointed a gun at him and demanded money. Bautista-Mora described how the truck had "some kind of [an] iron on the back for a ladder, climbing." While he did not see the robber's face, he recognized the truck in the photographs of the truck involved in the Taco Cabana robbery.

Reyes testified how he and Delacruz were in front of Delacruz's mattress store when a bearded white male wearing a dirty white shirt drove up in a white truck, pointed a gun at Delacruz and demanded money. Reyes could not identify the robber in a photo array, but he was confident that the truck in the photos from the Taco Cabana robbery was the same truck as in the Delacruz robbery. Shortly after passing Reyes's location, Sgt. Miller saw an older, dirty, white truck, with a black metal headache rack, chrome running boards, and paper plates. The driver of the truck was a bald white male. Once the driver, Clements, was apprehended, police found a cellphone belonging to Delacruz on him.

Clements argues that two of the witnesses, Bautista-Mora and Reyes, could not identify Clements as the robber, so there is no way that the evidence of the extraneous offenses could help establish the robber's identity. But all three robberies shared specific characteristics. *See Thomas*, 126 S.W.3d at 144 (reviewing courts should consider the specific characteristics of the offenses). Murray, Bautista-Mora, and Reyes all provided evidence that the robber was a white male, wearing a dirty

18

white shirt, who was driving a white truck with a metal fixture on the back with paper plates, and pointed a gun at the person he demanded money from. Murray and Reyes both described the robber as having facial hair. All three robberies occurred close in time and place. *See Lane*, 933 S.W.2d at 519 (sufficient similarity can be shown by proximity in time and place). And Clements was in possession of the cellphone stolen from Delacruz.

Thus here, the extraneous offenses share significant similarities with the charged offense, and although there are some differences between the three robberies, these differences do not outweigh the similarities. *See Page*, 213 S.W.3d at 338 ("extraneous-offense evidence" does not need "to be completely identical to the charged offense to be admissible to prove identity"); *see also Hill v. State*, No. 01-16-00595-CR, 2017 WL 2290201, at *5 (Tex. App.—Houston [1st Dist.] May 25, 2017, pet. ref'd) (mem. op., not designated for publication) (extraneous offense was sufficiently similar where robberies occurred within a day of each other, were committed in the Houston metro area and "at a gas station with a convenience store," where robbers demanded money at gunpoint from the cashiers using a black handgun, wearing dark hoodie, baseball cap, and black mask). We conclude the trial court did not abuse its discretion in determining that the similarities between the charged offense and the extraneous offenses are sufficient to prove identity.

The extraneous-offense evidence is prejudicial, but nearly all evidence presented against a defendant is. *See Montgomery v. State*, 810 S.W.3d 372, 378 (Tex. Crim. App. 1990); *see also Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013). Thus, our concern when considering Rules 403 and 404(b) is the unfair prejudicial effect. *Montgomery*, 810 S.W.2d at 377–78. "Under Rule 403, it is presumed that the probative value of relevant evidence exceeds any danger of unfair prejudice. The rule envisions exclusion of evidence only when there is a clear disparity between the degree of prejudice of the offered evidence and its probative value." *Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009) (cleaned up). Rule 403 does not allow a trial court to exclude relevant evidence simply because it is prejudicial. *Pawlak*, 420 S.W.3d at 811.

When conducting a Rule 403 analysis, we balance: "(1) how probative the evidence is; (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence." *Colone v. State*, 573 S.W.3d 249, 266 (Tex. Crim. App. 2019). The probative value refers to how much the evidence makes the existence of a "fact of consequence" "more or less probable" and to how much the proponent needs the evidence. *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010) (quoting *Casey v. State*, 215 S.W.3d 870, 879 (Tex.

Crim. App. 2007)). Unfair prejudice refers to how likely the evidence might cause for a result made on an "improper basis," including "an emotional one." *Id.*

First, considering how probative the evidence is, as previously stated, there were significant similarities between the three robberies, and they occurred within close time and physical proximity to each other. *See Thomas*, 126 S.W.3d at 144; *Lane*, 933 S.W.2d at 519; *see also Hill*, 2017 WL 2290201, at *5. Moreover, the evidence of the extraneous offenses was offered to prove a highly disputed fact: the identity of the person who robbed Murray. Accordingly, the trial court could have determined that the probative value of the extraneous offenses weighed in favor of admission.

As for whether the evidence would affect the jury in some irrational way, Clements contends that the evidence of evading in a motor vehicle and two additional aggravated robberies, with one alleging that he pointed a gun at a child, was incredibly prejudicial. But the trial court instructed the jurors five separate times that they could only consider the extraneous-offense evidence if they found that the offense had been proven beyond a reasonable doubt, and then only for the limited purpose of determining the Taco Cabana robber's identity. The written jury charge also gave the same instruction. Limiting instructions have a mitigating effect on the danger of unfair prejudice. See *Lane*, 933 S.W.2d at 520; *Beam v. State*, 447 S.W.3d 401, 405 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (noting that "the

21

impermissible inference can be minimized through a limiting instruction"); *see also*

*Resendiz v. State*, 112 S.W.3d 541, 546 (Tex. Crim. App. 2003) (appellate courts presume jury follows instructions).

As for Clements's argument that the extraneous offenses also introduced a crime other than aggravated robbery, evading in a motor vehicle, the testimony on the charged offense depicted a more serious offense than evasion because the perpetrator pointed his gun at Murray while demanding money from her. The evidence regarding the charged offense "likely overshadowed any inflammatory response" the jury may have had to evidence of evading arrest. *See Burke v. State*, 371 S.W.3d 252, 258 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). Therefore, the trial court could have reasonably determined that the evidence would not impress the jury in an irrational manner and that this factor weighed in favor of admission.

Turning to the time needed to develop the extraneous-offense evidence, the testimony of Bautista-Mora and Reyes was brief and focused on addressing identity. Sgt. Delacruz, Officer Wright, and Sgt. Miller also gave limited testimony related to the extraneous robberies discussing the proximity of the robberies to each other in time and place, the descriptions of the perpetrator, and how they located, pursued, and apprehended Clements. The guilt-innocence phase of the trial took three days, and the record was over 500 pages long, while the extraneous-offense testimony was about 100 minutes long. Therefore, the trial court could have reasonably determined

that the time factor weighed in favor of admission. *Compare Schiele v. State*, No. 01-13-00299-CR, 2015 WL 730482, at *7–8 (Tex. App.—Houston [1st Dist.] Feb. 19, 2015, pet. ref'd) (mem. op., not designated for publication) (that evidence in dispute spanned 50 pages of 118-page record and was also admitted through two recordings weighed against admissibility because evidence consumed "not insignificant" amount of time, but trial court did not abuse its discretion where half of Rule 403 factors weighed in favor of admission), *and McGregor v. State*, 394 S.W.3d 90, 121–22 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (affirming admission despite evidence of extraneous offenses constituting one third of trial weighed against admissibility), *with Russell v. State*, 113 S.W.3d 530, 544–49 (Tex. App.—Fort Worth 2003, pet. ref'd) (trial court erred by admitting evidence of extraneous offenses where evidence was 30% of testimony, State did not need evidence because it had ample evidence of intent, and extraneous offense was "more heinous" than charged offense).

Lastly, considering the State's need for the evidence, courts should consider whether the proponent had other evidence to establish the fact of consequence, how strong the other evidence was, and whether the "fact of consequence related to an issue that is in dispute." *See Erazo v. State*, 144 S.W.3d 487, 495–96 (Tex. Crim. App. 2004) (quoting *Montgomery*, 810 S.W.2d at 390). As previously discussed, the non-extraneous offense evidence connecting Clements to the charged offense was

23

(1) Murray's identification of him from a photo array, (2) the weapon found near Clements was like Murray's description, and (3) the description and photos of the truck matched the truck that Clements was found driving before his arrest. But Clements also raised the issue of identity during defense counsel's opening statement and the cross-examination of the State's witnesses. And he notified the trial court that he planned to call an expert witness, Dr. Terrell, to testify on eyewitness identification and brain memory retention. Accordingly, this factor weighs in favor of admission. *See Lane*, 933 S.W.2d at 521 (holding that the need for extraneous offense evidence is greatest when the evidence supports an element of a "hotly contested issue").

Considering all the factors together, we overrule Clements's issue because the trial court acted within the zone of reasonable disagreement when it determined that the probative value of the extraneous-offense evidence was not substantially outweighed by its prejudicial effect. *See De La Paz*, 279 S.W.3d at 343; *Lane*, 933 S.W.2d at 519.

## Jury Charge

Clements contends that the jury charge included an improper comment on the weight of the evidence because an instruction implied that the trial judge believed guilt had been proven beyond a reasonable doubt and the case would proceed to the

punishment phase. The State responds that Clements's argument is unsupported by the law and the trial court provided the jury with a permissible jury charge.

## A. Standard of Review

When reviewing for jury charge error, we apply a two-step procedure. *See Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012) (citing *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994)). Step one requires the appellate court to determine whether there is error in the charge. *Id.* If there is error, the appellate court must conduct a harm analysis. *Celis v. State*, 416 S.W.3d 419, 423 (Tex. Crim. App. 2013). If there was error and a defendant timely objected, then reversal is required if the defendant was harmed. *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016). But if a defendant did not timely object, "then reversal is required only if the error was so egregious and created such harm that the defendant did not have a fair and impartial trial." *Id.*

## B. Analysis

The trial court must give a written charge to the jury that sets forth the applicable law in the case. *See* TEX. CODE CRIM. PROC. art. 36.14. If the defendant objected at trial, then he will obtain relief if the record shows that he suffered "some harm." *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013) (citing *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1985) (op. on reh'g)). A reviewing court must consider: (1) the entire jury charge, (2) counsel's arguments,

(3) all the evidence, and (4) any other relevant information revealed by the trial record. *Id.* This standard requires the reviewing court to determine whether the defendant suffered actual harm from the error and not merely theoretical harm. *Warner v. State*, 245 S.W.3d 458, 462 (Tex. Crim. App. 2008). In this situation, neither party has a burden on appeal to show harm. *Reeves*, 420 S.W.3d at 816.

Clements argues that the trial court improperly commented on the weight of the evidence by instructing the jury that "[y]our sole duty at this time is to determine the guilt or innocence of the defendant under indictment in this cause and restrict your deliberations solely to the issue of guilt or innocence of the defendant." Clements objected that the instruction constituted an improper comment on the weight of the evidence because it suggested that "there's going to be another proceeding." Clements requested that the trial court instruct the jury that its sole duty was "to determine whether the State has proven each element of the offense beyond a reasonable doubt." The trial court overruled the objection.

First, we must determine whether error occurred; if error did not occur, our analysis ends. *Kirsch*, 357 S.W.3d at 649. Here, the charge did not improperly comment on the weight of the evidence because it followed the statutory directive of Article 37.07 of the Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. art. 37.07. Section 2(a) of Article 37.07 provides that "[i]n all criminal cases . . . which are tried before a jury on a plea of not guilty, the judge shall, before argument begins,

26

first submit to the jury the issue of guilt or innocence of the defendant of the offense or offenses charged, without authorizing the jury to pass upon the punishment to be imposed." *Id.* art. 37.07 § 2(a). Additionally, the jury charge specifically instructed the jury that "[a]ll persons are presumed innocent," that the law does not require the defendant to prove his innocence, and that it should acquit Clements unless it found him guilty beyond a reasonable doubt. We follow the decisions of our sister courts in determining that an instruction of this type is not erroneous. *See Avila v. State*, 15 S.W.3d 568, 576–77 (Tex. App.—Houston [14th Dist.] 2000, no pet); *Flores v. State*, 920 S.W.2d 347, 357 (Tex. App.—San Antonio 1996, pet. dism'd); *Barnes v. State*, 855 S.W.3d 173, 175 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd).

Because there was no error in the jury charge, we overrule Clements's jury charge issue. *See Kirsch*, 357 S.W.3d at 649.

### Extraneous Acts: Punishment

Clements contends that the trial court should have excluded evidence of the extraneous robberies presented during the punishment phase of the trial because the witnesses could not identify the perpetrator, so the offenses were not relevant and could not be proven beyond a reasonable doubt. The State contends that all the challenged evidence was properly admitted, and even if there was error, Clements was not harmed.

## A. Standard of Review and Applicable Law

We review a trial court's ruling on the admissibility of extraneous offense evidence for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). If the trial court's ruling was within the bounds of reasonable disagreement, it should not be disturbed. *Shuffield v. State*, 189 S.W.3d 782, 793 (Tex. Crim. App. 2006).

Article 37.07, Section 3(a)(1) of the Code of Criminal Procedure states that during the sentencing phase, the State may offer evidence "as to any matter the court deems relevant to sentencing." TEX. CODE CRIM. PROC. art. 37.07 § 3(a)(1). This includes "evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act." *Id.* "Relevant" is not defined, but the statute also provides that evidence relevant to sentencing includes: (1) the defendant's criminal record; (2) the defendant's general reputation; (3) the defendant's general character; (4) an opinion about the defendant's character; (5) the circumstances of the offense being tried; and (6) if admissible, any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt to have been committed by the defendant or for which the defendant could be held criminally responsible, no matter if the defendant has previously been charged with or finally

28

convicted of the crime or act. *Id.* Determining relevance is a question of what helps the jury in determining the appropriate sentence for a particular defendant in a particular case. *See Rogers v. State*, 991 S.W.2d 263, 265 (Tex. Crim. App. 1999).

The trial court makes threshold determinations on the admissibility of extraneous offenses, but the factfinder ultimately decides whether the State carried its burden with respect to those offenses. *Mitchell*, 931 S.W.2d at 953. Before the jury can consider the evidence of extraneous offenses, it must be satisfied beyond a reasonable doubt that the evidence is attributable to the defendant. But the offering party does not have to "prove that the act was a criminal act or that the defendant committed a crime." *Haley v. State*, 173 S.W.3d 510, 515 (Tex. Crim. App. 2005); *see also Smith v. State*, 577 S.W.3d 548, 551 (Tex. Crim. App. 2019). The burden of proof applies "to a defendant's involvement in the act itself, instead of the elements of a crime necessary for a finding of guilt." *Id.*; *see also Thompson v. State*, 425 S.W.3d 480, 491 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd).

If the reviewing court determines that the admission of extraneous acts was error, it must then determine whether the error was harmful. *Jabari*, 273 S.W.3d at 754. The erroneous admission of an extraneous offense is not constitutional error and undergoes a harm analysis under Texas Rules of Appellate Procedure 44.2(b). *Id.*; *see* TEX. R. APP. P. 44.2(b). Any error must be disregarded unless it affected the appellant's substantial rights. *Jabari*, 273 S.W.3d at 754; *see* TEX. R. APP. P. 44.2(b).

An error affects a substantial right when it has a substantial and injurious effect or influence on the jury's verdict. *Jabari*, 273 S.W.3d at 754 (citing *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000)). The reviewing court should not overturn a conviction for non-constitutional error if, after considering the entire record, it is assured that the error did not influence the jury or only had a slight effect. *See Motilla v. State*, 78 S.W.3d 352, 355–56 (Tex. Crim. App. 2002).

## B. Extraneous Acts Evidence

The State introduced evidence from five more robberies, a determination that Clements engaged in delinquent conduct as a juvenile, prior miscellaneous convictions as an adult, and evidence that he had a weapon in jail. Clements only complains of the evidence of the five robberies, so we only address that.

### 1. Aguilar Robbery

M. Aguilar was never called to testify, but the evidence of this robbery was offered through the testimony of Officer N. Alvarado. Officer Alvarado testified that he responded to a robbery on May 29, 2019.[4]

Clements objected to Officer Alvarado's testimony because the complainant of the extraneous aggravated robbery could not identify the perpetrator but described him as a black male, and the State could not prove the offense beyond a reasonable

---

[4]    Officer Alvarado testified that this incident occurred on May 29, 2019, but the ballistics report lists the offense date as May 30, 2019.

doubt. The State responded that Clements's identity as the perpetrator would be established by evidence that a casing found at the crime scene was linked to the gun recovered when police apprehended Clements for the charged offense. Clements requested a hearing outside the presence of the jury, but the trial court indicated that it would rule on the relevance of the evidence as it was developed.

Officer Alvarado testified that he arrived at a residence with a fenced-in driveway. He entered the fenced-in area and found Aguilar with a bloody gash above his left eye and a gunshot wound to the lower leg. Aguilar's white GMC truck was stolen, and a nine-millimeter shell casing was recovered from the scene. Clements objected to the testimony and State's Exhibit 100 as irrelevant and violating his right to confront the witness, but the trial court overruled the objection "subject . . . to [the State] proving up relevancy." State's Exhibit 100 is the shell casing taken from the scene that was submitted for ballistics testing. Clements objected pursuant to the prior relevance and confrontation clause objections, but the trial court overruled the objection "subject to relevancy."

M. Mally, a senior firearms examiner at the Houston Forensic Science Center, testified that she examined State's Exhibit 26, the nine-millimeter Luger Taurus semiautomatic pistol recovered near Clements in connection with the charged offense. She compared the spent casing from the Aguilar robbery with State's Exhibit 26 and stated that the spent casing was fired from that weapon.

### 2.      **Villegas Robbery and Betancourt Robbery**

The J. Villegas robbery was in May 2019. While he was at a taco truck, J. Villegas was robbed by three men who arrived in a green or blue-colored Dodge Dakota truck. One man pointed at a gun at Villegas and demanded his possessions. When he tried to fight back against his attackers, the man pistol-whipped him. A bullet was fired during the altercation, but Villegas was not shot. One of the robbers took his money and wallet, and the gunman got into his 1999 Chevy Silverado truck and drove off. Then the robber driving the Dakota tried to run Villegas over. The State offered a video of this incident, which Clements objected to. The trial court asked the State "where [it] was going with this?" The State acknowledged that it was calling witnesses out of order, and the witness that could establish the relevance of Villegas's testimony and State's Exhibit 115 was on his way to testify. The court then "[overruled] the objection . . . saying its [sic] subject to relevance with the other witness," and admonishing the State that the trial court "[didn't] want to do that again because I don't want to—I rather this come in, let the jury hear all this, and then at some point in time it becomes irrelevant, and then I got to instruct the jury to disregard it all after they've heard it."

Villegas's testimony was then paused so that the witness who could establish the relevance of Villegas's testimony could testify, after which Villegas would be re-called to finish his testimony. The State then called two witnesses who testified

on matters other than the robberies. Afterward, the State called J. Betancourt to testify about the robbery that occurred in 2017. This was a robbery that Clements had previously pleaded to and was disposed of.

After Betancourt's testimony, the State re-called Villegas. The State then informed the court that Villegas "is going to testify to the fact that when his car was stolen the license plate off his car, the paper tag, was then found on the recovered vehicle in the evading, the white truck that's already been admitted into evidence. So the paper tag attaches the two cases together." Clements then pointed out that "[t]here's still an identity issue and this witness couldn't identify who robbed him." The court overruled the objection, anticipating that Villegas could identify the truck. Villegas testified about the details of the robbery, and that the license plate was stolen from his vehicle during the robbery. Villegas testified that he recognized the license plate depicted in State's Exhibit 18 as the license plate stolen from his truck. Villegas was shown State's Exhibit 17, a photograph of the truck used by Clements during the commission of the charged offense. Villegas testified that his stolen license plate was on the white truck in State's Exhibit 17, but the white truck did not belong to him.

A video of the robbery, State's Exhibit 115, was offered into evidence after Villegas testified that it accurately depicts the robbery. Clements objected to the admission of the video, arguing that it violated due process, the confrontation clause,

33

and was not relevant because Villegas could not connect Clements to the scene of the robbery. The trial court sustained the objection. Villegas then testified that he was forced to jump in a ditch when the driver of the blue Dodge Dakota tried to run over him and shot at him three times. Villegas identified two persons from a photo array as the driver of the Dakota and as the person who struck him with a gun. Neither person was Clements.

The State again offered the surveillance video, State's Exhibit 115, and argued that it was relevant because the Villegas's stolen license plate was found on the same vehicle Clements used in the charged offense. The State also argued that one of the suspects in the surveillance video physically resembles Clements. But, after a bench conference. the State moved on to other witnesses before State's Exhibit 115 was admitted. The State later tried to get State's Exhibit 115 admitted after it elicited testimony from Villegas that the blue truck shown in the surveillance video had stickers on the rear window in similar locations as the stickers on the rear window of the blue truck shown in State's Exhibit 806. Clements objected that the extraneous offense had not been proven beyond a reasonable doubt, but the trial court overruled the objection and admitted State's Exhibit 115.

### 3. Holzer Robbery

The State then called L. Holzer, another complainant in an extraneous robbery, as its next witness. Clements objected to Holzer's testimony because he

could not identify the perpetrator and the State could not prove the extraneous offense beyond a reasonable doubt. After a bench conference, the jury was released, and trial was set to resume the following business day. The next day, the State moved on to calling Detective G. Goodnight and C. Castaneda to testify about the Castaneda robbery before returning to Holzer.

Holzer testified, outside the presence of the jury, that he was robbed on May 25, 2019. He stated that he was walking down the street he lives on when he noticed that a vehicle was following him. When he changed directions, the vehicle stopped, and a man with a gun got out of the vehicle and threatened to shoot him. The gunman stole his phone, car keys, and house keys. Holzer testified that State's Exhibit 114, a surveillance video, accurately depicted the robbery. Holzer acknowledged on cross-examination that he could not identify the perpetrator in a photo array. Clements objected to the admission of Holzer's testimony and State's Exhibit 114, arguing that the State did not prove the extraneous offense beyond a reasonable doubt, that it violated due process, and violated Rule 403 as prejudicial. The trial court overruled the objection and admitted the testimony and video.

Holzer then gave similar testimony before the jury that he was robbed on May 25, 2019 by a bald white male. The surveillance video shows a bald white male driving a blue Dodge Dakota truck. He also testified that the blue truck shown in

State's Exhibit 806 appeared to be the same blue truck used during the commission of the aggravated robbery.

### 4. Castaneda Robbery

C. Castaneda testified that he was the victim of a theft at a gas station in either March or April 2019. Castaneda was standing at the pump when he noticed that an older green or blue model Dodge or Chevy truck parked next to him. The driver of the truck exited the vehicle wearing a mask, approached him, and demanded money at gunpoint. They struggled, and the robber's mask slipped down, enabling Castaneda to see his face. The man took his wallet and struck Castaneda in the head with the gun.

Castaneda was shown a photographic array in June 2019 by Detective G. Goodnight, and he positively identified Clements as the robber. At trial, he testified that the blue truck shown in State's Exhibits 801 and 806 appeared to be the same truck used by Clements during the robbery.

## C. Analysis

We conclude that the trial court reasonably could have determined that the extraneous acts were relevant, and that the State proved Clements was involved in the extraneous acts. The extraneous aggravated robbery of Aguilar occurred on the same date that Clements robbed Murray, Bautista-Mora, and Delacruz at gunpoint. And the State elicited unchallenged evidence that the spent casing recovered from

36

the crime scene was fired from the same handgun that had Clements's DNA on it. That gun was recovered only a short distance from Clements when he was apprehended. Because Clements did not object to the ballistics evidence linking him to the extraneous robbery, he cannot complain on appeal about its admission. *See Thompson v. State,* 4 S.W.3d 884, 886–87 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd) (defendant must object to preserve error in the admission of extraneous offenses).

Villegas was also robbed at gunpoint in May 2019. Villegas, Aguilar, Castaneda, and Betancourt were all pistol-whipped during their robberies. There was also evidence connecting the robbery of Villegas with other robberies where Clements was identified as the perpetrator, such as the license plate that was on Villegas's stolen vehicle and later found on the white pickup truck used by Clements during the charged offense. The State also elicited testimony from Villegas that the blue Dodge Dakota used by the robbers looked like the same blue truck used during the robbery of Castaneda, who positively identified Clements as the person who robbed him at gunpoint. Holzer was also robbed at gunpoint on the same date that Clements committed the charged offense. The surveillance video of the robbery shows a bald white male in a blue Dodge Dakota truck. Although Holzer could not identify the perpetrator, he testified that the photograph of the blue Dodge truck used during the robbery of Castaneda appeared to be same truck used by the gunman.

Given the evidence linking Clements to similar robberies, the trial court did not abuse its discretion in determining that the extraneous offense evidence was relevant and that a rational jury could find beyond a reasonable doubt that the extraneous offenses were attributable to Clements. *See Haley*, 173 S.W.3d at 515. Because there was no error, we need not address whether Clements was harmed. *See* TEX. R. APP. P. 47.1. We overrule Clements's final issue.

## Conclusion

Accordingly, we affirm the trial court's judgment.


Sarah Beth Landau
Justice

Panel consists of Justices Landau, Countiss, and Guerra.

Do not publish. TEX. R. APP. P. 47.2(b).